102 S.W.3d 268 (2003)
In the Interest of N.V.D., a child.
No. 09-01-073-CV.
Court of Appeals of Texas, Beaumont.
Submitted February 6, 2003.
Decided March 13, 2003.
Terri C. Mendez, Conroe, for appellant.
David K. Walker, County Atty., Suzanne Laechelin, Asst. County Atty., Conroe, for appellee.
*269 Before McKEITHEN, C.J., BURGESS and GAULTNEY, JJ.

OPINION
PER CURIAM.
Tammy Lynn Dougherty appeals the jury verdict terminating her parental rights with her son, N.V.D. The Texas Department of Protective and Regulatory Services ("Department") initiated the suit shortly after N.V.D.'s first birthday, after the child was diagnosed with failure to thrive and hospitalized for pneumonia and dehydration. Dougherty presents three issues in her appeal.
In issue one Dougherty complains that the trial court failed to conduct a permanency review hearing and sign a permanency review order within statutory guidelines. The trial court timely extended the dismissal date from September 18, 2000, to March 11, 2001. See Act of May 31, 1997, 75th Leg., R.S., ch. 1022, § 90, 1997 Tex. Gen. Laws 3733, 3768 (amended 2001) (current version at Tex. Fam.Code Ann. § 263.401 (Vernon 2002)). Dougherty does not challenge the trial court's jurisdiction, but argues that she was harmed by the trial court's failure to conduct a subsequent permanency review hearing within 120 days of the previous permanency review hearing. The initial permanency hearing must be conducted within 180 days of the date the trial court renders a temporary order appointing the Department as temporary managing conservator of the child. See Tex. Fam.Code Ann. § 263.304(a) (Vernon 2002). The initial permanency review hearing was timely held on January 24, 2000. A subsequent permanency hearing must be held no later than the 120th day after the date of the last permanency review hearing. Tex. Fam.Code Ann. § 263.305 (Vernon 2002). The trial court timely conducted the April 24, 2000, permanency review. The Department concedes that the November 30, 2000, subsequent permanency hearing was not timely conducted. The delay is attributable to the fact that the appellant obtained a continuance of the July 24, 2000, trial setting, over the Department's objection. At the July 10, 2000, hearing on the motion for continuance, Dougherty's counsel advised the trial court that her client had originally intended to relinquish her rights, but had gone away for a few months and experienced a change of heart, so that counsel needed additional time to obtain another home study. The trial court conducted a pre-trial hearing on August 21, 2000, but did not conduct a permanency review hearing at that time. There is nothing in the record to indicate that trial counsel requested a permanency review hearing at this time. The trial court's docket sheet indicates that a September 7, 2000, trial setting was also continued on the motion of the respondent. Dougherty raised the failure to conduct a permanency review hearing for the first time in a motion for summary judgment filed November 8, 2000. At a November 20, 2000, hearing, the Department's counsel advised the court that the Department had conducted permanency planning team meetings with the foster family and any interested members of the child's family. The trial court conducted a permanency review hearing on November 30, 2000, and denied the motion for summary judgment on December 7, 2000.
Dougherty argues that the trial court's inaction deprived her of the opportunity to work toward reunification. According to the appellant, the trial court doubled the frequency of the visits after the November 30, 2000, hearing. Had the extra visits commenced in August, she reasons, the evidence from those visits "would have made a significant difference in a jury finding." Because it did so in November, *270 Dougherty assumes that the trial court would have ordered home visits in August. This conclusion is far too speculative, considering that Dougherty had disappeared for several months, did not exercise her visitation rights between November 17, 1999, and June 23, 2000, and at the November 30, 2000, hearing, Dougherty's counsel was still trying to obtain an amended home study that would alter the previous recommendation against permitting N.V.D. to return to the Dougherty household. The appellant assumes the quality of evidence gleaned from three extra months of contact would have improved her chances of convincing the jury that she was capable of parenting, but she does not specify what additional evidence would have been developed had the home visits commenced on an earlier date. As it was, Dougherty was not deprived of access to her child during the period of time in question and the jury did hear testimony about home visits.
The appellant asserts that "[s]ince no permanency review hearing was conducted the Court could not determine whether the intervention by the grandmother, parenting classes, or a change of circumstances would alleviate or mitigate the cause necessitating the placement of the child in foster care or work towards reunification of the family." Actually, the trial court conducted three permanency review hearings. Parenting classes and intervention by the maternal grandmother did not affect the placement of the child in November 2000, so we have no reason to believe that those factors would have differently influenced the court in August 2000. The delay in conducting a subsequent permanency hearing was unfortunate. However, that delay was attributable to Dougherty's requests to continue the trial setting, and trial counsel's failure to timely request a permanency review hearing. The trial court conducted the hearing as soon as the lapse was brought to its attention, and the appellant has not demonstrated that the delay probably caused the rendition of an improper judgment. Further, we believe that, had trial counsel timely requested a permanency review hearing, and the court denied the request, the proper remedy would be to file a writ of mandamus with the appellate court. Issue one is overruled.
Issue two urges, "The Department failed to make reasonable efforts toward reunification after the removal of the child as set forth by the statutory guidelines." The appellant argues that the Department violated federal law by not making reasonable efforts towards reunification of the family. See 42 U.S.C.A. § 671(a)(15) (West Supp.2002). Our legislature implicitly incorporated the requirements for federal funding into the Family Code. See Tex. Fam.Code Ann. §§ 261.001-265.003 (Vernon 2002)(Subtitle E, Protection of the Child). In its initial order for protection, the trial court found that "all reasonable efforts, consistent with time and circumstances and pursuant to 42 U.S.C. §§ 671(a)(15) and 672(a)(1), have been made by the Petitioner to prevent or eliminate the need for removal of the child the subject of this suit from the home and to make it possible for the child to return home, but it is not in the child's best interest to remain at home." At that time, the Department had provided family-based services for two months, including in-home counseling, a psychological examination for Dougherty, day care, and payment of an electric bill. Dougherty does not dispute the propriety of the initial removal, but argues that the trial court erred in failing to grant her Motion Notwithstanding the Verdict based upon the Department's subsequent failure to make reasonable efforts to reunify the family. The original petition pleaded for termination as an alternative *271 to reunification. The family service plan dated October 5, 1999, identifies adoption as the Department's long range goal for permanency.
The requirement to show by clear and convincing evidence that the termination is in the best interest of the child subsumes the reunification issue and guarantees the constitutionality of termination proceeding. Edwards v. Texas Dep't of Protective and Regulatory Servs., 946 S.W.2d 130, 139 (Tex.App.-El Paso 1997, no writ). A separate consideration of alternatives to termination is not required. Id. Therefore, we will consider issue two in conjunction with the appellant's challenge to the jury's finding that the parent-child relationship between Dougherty and N.V.D. should be terminated.
Issue three contends the "evidence was factually insufficient to support the jury finding that termination of the appellant's parental rights was in the best interest of the child." The appellate standard for reviewing termination findings is whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations. Interest of C.H., 89 S.W.3d 17, 25 (Tex.2002). The factors examined in ascertaining the best interest of a child include: 1) the desires of the child; 2) the emotional and physical needs of the child now and in the future; 3) the emotional and physical danger to the child now and in the future; 4) the parental abilities of the individuals seeking custody; 5) the programs available to assist these individuals to promote the best interest of the child; 6) the plans for the child by these individuals or by the agency seeking custody; 7) the stability of the home or proposed placement; 8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and 9) any excuse for the acts or omissions of the parent. See Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex.1976).
The appellant argues that N.V.D.'s treating physician misdiagnosed him with failure to thrive due to failure to feed. The medical evidence supports the diagnosis. At birth N.V.D. weighed eight pounds, above average, and was twenty inches in height. By three months of age, N.V.D. had fallen to the 5th percentile on the weight chart. Dougherty's testifying expert, a pediatrician named Allen Kline testified that a baby experiencing a lack of caloric intake should rapidly advance to the 10th to 75th percentile on the growth chart once he is cared for properly. Dr. Kline did not see a rapid weight gain following removal in N.V.D.'s case. Generally speaking, some children initially diagnosed as failure to thrive actually have constitutional growth failure. After examining the child, Dr. Kline reported that he could neither say that N.V.D. had failure to thrive, nor that N.V.D. did not have failure to thrive. On September 6, 2000, he stated, "After review of all the medical records available, it appears that the mother and maternal grandmother are incompetent care givers and that this child would flourish better in a caring foster environment. They both smoke and neither seem to understand the importance of staying with the child while hospitalized. They also went to the ER after midnight with a two week old rash." After examining the child a second time, on October 17, 2000, Dr. Kline reported that, at two years of age, N.V.D.'s skeletal bone age was delayed six months. Dr. Kline stated, "This in itself is not a diagnostic finding to separate organic from non-organic [failure to thrive] but does add to the definition that [failure to thrive] does exist." At trial, Dr. Kline stated that he could rule out an organic cause for N.V.D.'s failure to thrive and agreed that the May 1999 diagnosis *272 of failure to thrive was "an adequate judgment."
While an intern, Dr. Emily Frye attended N.V.D. during his July 1999 hospitalization for failure to thrive and severe eczema. She was told that the maternal grandmother was the child's primary care giver. She recalled that N.V.D. was usually alone in the hospital, although the family was asked to stay with him. The child gained 70 grams every day that he was hospitalized. The family was provided with a food plan and medication for the eczema; they were encouraged to make a food journal for recording everything eaten by the child. They were told not to smoke around the child. Further monitoring revealed that N.V.D.'s growth rate and skin condition worsened. Dougherty never personally brought the child to the clinic after the hospitalization. In August 1999, Frye reported that the child, who had gained one pound while hospitalized, had decreased in weight from 18 pounds 6 ounces to 17 pounds 12 ounces from his previous visit. When N.V.D. was hospitalized in September, Dr. Frye noted that neither the mother nor the grandmother was following the instructions for the baby's care. When Dr. Frye told the grandmother that N.V.D. needed to be given his bottle, the grandmother placed the bottle in the crib without picking up the child or encouraging him to feed. When Dr. Frye examined him in September 2000, N.V.D. was still below normal in weight, but his length and head circumference were catching up. The curve indicated on N.V.D.'s growth chart was a positive finding.
Dr. Glenn Minter, Emily Frye's supervising physician, testified that N.V.D's weight became lower on the graph than the length and the head circumference, indicating failure to thrive. Medical tests revealed no organic cause for the condition. Dr. Minter testified that a non-organic cause of failure to thrive usually implies lack of feeding, care, and attention. The medical personnel treating N.V.D. in September 1999 noted in N.V.D.'s medical records that N.V.D. was not being adequately changed and fed, that his mother yelled at the baby for vomiting and did not hold him, and she was "very oblivious to the child's needs." In Dr. Minter's opinion, N.V.D.'s major problem was failure to thrive for failure to feed.
Dr. Kline opined that Dougherty's rights should not be terminated because she has not abused the child; her problem is a lack of parenting skills. He noted that by obtaining a certificate of completion of a course of Systematic Training for Effective Parenting, Dougherty, her mother, and her mother's companion had demonstrated that they really did want the child. Dougherty also relies upon the testimony of the Department's psychologist, Michael R. Gilhousen, that a person with an I.Q. of 69, such as the appellant, is capable of learning. However, Gilhousen, also testified that, in his opinion, Dougherty would not be able to raise her child on her own. According to Gilhousen, the appellant suffers from a mental or emotional illness or mental deficiency that renders her unable to care for the physical, emotional, and mental needs of the child, now and throughout his minority.
The Department argues that N.V.D. is medically needy due to severe eczema and allergies. He requires daily skin treatments and a weekly allergy shot. He is allergic to cigarette smoke, and Dougherty has not quit smoking. Neither have the other two adult occupants of the home. At trial, Dougherty could not recall what N.V.D.'s food allergies were, but stated that a list was on the refrigerator. The lack of bonding between mother and child was noted by the hospital staff. Dougherty *273 does not have a high school diploma or GED; she is unemployed and supported entirely by her mother. Dougherty's mother testified that she had previously made a sworn statement that it was not in N.V.D.'s best interest for Dougherty to be his sole managing conservator. Although Dougherty's mother was willing to raise the child at the time of trial, she had initially declined to accept responsibility for the child and had been referred to Child Protective Services several times during Dougherty's childhood. The grandmother indicated that appellant had been called a failure-to-thrive baby too. She testified that she had been effectively acting as N.V.D.'s mother during the time he was diagnosed with failure to thrive and removed from her home.
Dougherty contends that there is no evidence to establish that the emotional and physical needs of the child, now and in the future, would be met by the termination of the parent-child relationship. We understand the appellant's argument to be that, by failing to work to reunify the family, the Department failed to rule out the possibility that skills gained in her parenting classes would enable her to raise N.V.D. Dougherty did not describe what skills she developed or training she received in her parenting class. Neither could Dougherty's mother relate her experience with the parent class that she took in September, other than to say, "Well, I believe anytime you take up anything like that, you are going to learn something. You learn to be a little more patient, listen a little more. Don't jump the gun so fast, so to speak." The jury heard testimony regarding the in-home visit on December 19, 2000. The CASA advocate, Sharon Kerr, testified that, over the course of observing eleven visits at the Department and five hours of in-home visits, it was very apparent to her that Dougherty did not know how to properly care for the child. Although she did not smell smoke when she arrived for the in-home visit, by the time she left both she and the baby reeked of smoke because Dougherty kept going to a bedroom to smoke. The foster mother had provided food, but at lunch time, the Doughertys made no effort to feed the child.
We must give due consideration to the evidence that the jury could have found to be clear and convincing. Unless its finding is so against the great weight of the evidence that it is clearly wrong and unjust, we cannot disturb the jury's verdict. Although appellant disputed the medical diagnosis of failure to thrive for failure to feed, the totality of the evidence is more than sufficient to allow the factfinder to form a firm belief or conviction that the diagnosis was accurate. The evidence that Dougherty was incapable of ever caring for N.V.D. on her own was essentially unchallenged. The extent and efficacy of the family support system was disputed, but the jury could reasonably form a firm belief or conclusion that the support available to Dougherty would not be sufficient to enable her to meet N.V.D.'s needs. Notwithstanding the evidence that the Department never considered reunification as a viable plan for permanency in this case, the evidence is not so weak that the jury could not form a firm belief that termination of the mother's parental rights was in the child's best interest. Issues two and three are overruled. The judgment is affirmed.
AFFIRMED.