# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00168-CV

**Patrick Melton, Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT
### NO. D-1-FM-06-004071, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Patrick Melton appeals the decree terminating his parental rights to his daughter E.M.[1] The decree was based on the jury's findings that the parent-child relationship should be terminated. Melton contends that the evidence is legally and factually insufficient to support a finding that clear and convincing evidence supported termination. Melton contends that the trial court's misinterpretation of relevant law caused it to fail to timely appoint him counsel, to improperly remove the child from his care, to fail to return the child to him as the case progressed, and to fail to dismiss within one year of filing while not making the findings necessary to extend the time allowed by statute for this suit to remain pending. Melton further contends that the trial court abused

---

[1] The parental rights of E.M.'s mother were also terminated. That decision was not appealed.

its discretion by making findings of fact and conclusions of law after a jury verdict. We affirm the judgment of the district court.

E.M. was born in 2001 while Melton was in prison. She is Melton's only child. Melton first saw her when she was sixteen months old. By the time of trial, he had been incarcerated for several different periods adding up to approximately forty of the eighty-two months of E.M.'s life. Melton had attempted to keep in contact with her through letters, pictures, and telephone calls, plus personal visits when he was not incarcerated. He and others testified that E.M.'s mother, Karena Norvell, sometimes avoided his telephone calls and attempted visits and, in effect, did not allow as much visitation as Melton wanted.

Melton has been arrested and incarcerated for offenses including possession of controlled substances (including marijuana and crack cocaine), evading arrest, resisting arrest, tampering with physical evidence, and assault with bodily injury. He admitted using marijuana, PCP, and powder cocaine, but testified without contradiction that he never sold or used drugs in E.M.'s presence. On occasion, arguments with Norvell and with his wife Alquici resulted in police being summoned, and there was testimony that he used physical force or threatened violence against Norvell as well as Alquici. Melton denied using force against them, or even arguing forcefully in E.M.'s presence except for once with Norvell during a frustrated attempt to take E.M. out for a visit.

The first court order concerning Melton's parental rights to E.M. was signed in 2003. It established Melton as her father, named him possessory conservator, and assessed child support. Melton testified that he was incarcerated when this order was issued and was not aware of it, although he at one point had wages garnished pursuant to it.

The investigation by the Department of Family and Protective Services that led to this appeal began in March 2006 when Norvell gave birth to a child and tests indicated that Norvell had used cocaine while pregnant. With the Department's approval, E.M. went to live with a relative. Without advance approval, E.M. then went to live with Norvell's family friend, Sylvia Patridge. Patridge testified that she had previously babysat E.M. on many occasions—sometimes when Norvell and Melton were arguing and sometimes while Norvell was using drugs. E.M.'s stays with Patridge had lasted periods ranging from a few hours to an entire summer. Norvell testified that she considered Patridge a mother figure, although Melton and his family testified they did not really know her. The Department conceded it did not contact or seek out the fathers of Norvell's children until preparing to file this suit.

By August 2006, testimony indicates that the a Department had determined to pursue termination of parental rights and adoption, although a Department caseworker testified that reunification should have been shown as a concurrent goal because the Department was offering services to the parents. Although Melton was incarcerated, he was taken to the show-cause hearing near the outset of these legal proceedings. Melton testified that he offered the names and addresses of family members who could care for E.M., but was told to give the information to the caseworker, which he testified he did. No studies were done and no consideration was given to placing E.M. with Melton's family members. The court appointed the Department as E.M.'s temporary managing conservator, and the Department maintained her residence with Patridge. The court ordered Norvell and Melton to follow the Department's service plan. The Department told Melton to obtain what services he could while incarcerated, and to contact the Department when he was released.

3

There was some dispute about how promptly Melton contacted the Department following his release, but he did contact the Department. Although Norvell relinquished her parental rights in February 2007, Melton complied with and completed many aspects of the service plan laid out for him. He completed parenting and protective parenting classes, attended counseling, was evaluated psychologically, self-reported that he did not need drug treatment, underwent drug tests, had supervised visitation with E.M., and attended barber school. Between May 4 and August 3, 2007, he scheduled nine visits with E.M. Taking the bus to the meeting site, he was late for four visits, and so late for a fifth that the Department cancelled the visit. He was arrested while attempting to sell drugs in January 2007, tested positive for drug use in May 2007,[2] used drugs in August 2007,[3] and was re-incarcerated before the trial concerning his parental rights. Shortly after

---

[2] The test could reflect drug use up to a year prior.

[3] In his brief, Melton asserts that his testimony that he used drugs in August 2007 was a "clear misstatement" because he was incarcerated in August 2007. This correction to his testimony was not before the jury. His testimony indicates that the August 2007 date was correct:

Q. So when was the last time that you used—you're admitting that you used the year prior to May 1st of 2007. When was the last time that you used?

A. I want to say August 2007.

Q. The last time you used was August of 2007.

A. Yes, ma'am.

Q. Okay. And what types of drugs were you addicted to?

A. To PCP, cocaine.

Q. All right. And—okay. So during this time period that you were engaging in services, you were still addicted to drugs then?

Melton's positive drug test, the Department set a trial to consider termination of his parental rights.[4]

The court appointed his trial counsel in June 2007.[5] The court then extended the deadline for determining whether to terminate appellant's rights for six more months.

At trial, the jury was asked whether grounds for terminating Melton's parental rights existed and whether termination would be in E.M.'s best interest. The charge submitted three different grounds for termination, but Melton did not ask the jury to find whether each specific ground supported termination. The jury answered in the affirmative, and the trial court entered judgment accordingly. Melton contends that the Department and the trial court violated his rights throughout the case below, from the original placement of E.M. with Patridge through the termination of his rights and concluding with making findings of fact after a jury trial.

Melton asserts that the trial court abused its discretion by failing to dismiss the suit within one year of the first temporary orders without making the findings required to show extraordinary circumstances. *See* Tex. Fam. Code Ann. § 263.401(b) (West 2008). However, Melton did not object to this alleged error in the trial court and, thus, has not preserved it for

---

A. I was in recovery. I was—I wasn't using. I was doing my services. It was a onetime thing that I used in August.

The testimony that he was using services when he relapsed is consistent with the August 2007 date, because this suit was not filed until August 2006 and Melton testified that he was not aware of its existence until he was brought to court—while incarcerated—on August 28, 2006. He was not engaging in services until after August 2006.

[4] The timing was also coincidental with the approach of the one-year deadline from the first orders appointing the department as temporary managing conservator. Tex. Fam. Code Ann. § 263.401(b) (West 2008).

[5] Court records indicate that trial counsel was substituted for previous counsel. Court records do not indicate when the first counsel was appointed.

appellate review. *See* Tex. R. App. P. 33.1; *In re Texas Dep't of Family & Prot. Servs.*, 210 S.W.3d 609, 613 (Tex. 2006). He also does not show how the delay before trial harmed him. The bulk of the conduct supporting the jury's finding had already occurred by the time of the extension. The extension gave him additional time to balance his previous conduct with additional visits, services, and other responsible behavior and gave his counsel additional time to advise him and prepare for trial. Melton has not demonstrated that any deficiency in the order or delay in the trial entitles him to reversal of the judgment.

Melton contends that the trial court abused its discretion by failing to appoint him an attorney at the outset of the lawsuit, and that the failure led to an improper judgment. As with the extension of the trial date, he does not demonstrate that he has preserved this issue for appellate review, that the trial court erred, or that he was harmed by that error. The statute concerning appointment of attorneys in termination cases provides that, "[i]n a suit filed by a governmental entity in which termination of the parent-child relationship is requested, the court shall appoint an attorney ad litem to represent the interests of . . . an indigent parent of the child who responds in opposition to the termination." Tex. Fam. Code Ann. § 107.013(a) (West Supp. 2009). Although Melton opposed termination at the initial show-cause hearing, there is no indication that he either asserted indigency, requested counsel, or complained of the lack of counsel at the trial court. It is, thus, not clear that he preserved this issue for appellate review. *See* Tex. R. App. P. 33.1; *cf. In re B.L.D.*, 113 S.W.3d 340, 354 (Tex. 2003) (error-preservation standards apply even when constitutional rights are involved). Further, the statute is silent as to when counsel must be appointed, unlike a similar statute that requires appointment of an attorney ad litem for the children

6

involved in termination proceedings "immediately after the filing of the suit but before the full adversary hearing." Tex. Fam. Code Ann. § 107.012 (West 2008). Courts have concluded that the legislature left the timing of the appointment of counsel for indigent parents to the discretion of the trial court. *In re M.J.M.L.*, 31 S.W.3d 347, 354 (Tex. App.—San Antonio 2000, pet. denied). The San Antonio court has held that appointment of counsel six months after the case began complied with the statute, particularly when the parent did not request appointment of counsel and appointed counsel had a year to prepare for trial. *Id.* at 354-55.

The appellate record is not clear when counsel was appointed for Melton, but a motion to substitute counsel was filed on June 1, 2007, and granted on June 5, 2007. Trial and appellate counsel represented him at the August 3 and December 7, 2007 permanency hearings and at the February 2008 trial. Counsel had almost two months to prepare for the August 2007 hearing, six months to prepare for the December 2007 hearing, and more than eight months to prepare for the February 2008 trial. Although Melton asserts that, if he had been represented by counsel, E.M. would have been returned to him and the case involving his parental rights dismissed, this bare assertion is not supported by the record.[6] Melton's appointed attorney had several months to prepare for trial and represented him zealously there. The bulk of Melton's conduct supporting termination

---

[6] Melton's assertion that the trial court would have "returned" E.M. to him or his family—with whom E.M. had never lived—instead of following the course of action it chose is speculation. Indeed, Melton was incarcerated at the initial hearing, so E.M. clearly would not have been "returned" to him personally at that time. Melton's assertion that a Department investigator testified that Melton posed no danger to E.M. is not entirely accurate. The investigator testified at trial that he believed that Melton posed no *physical* danger to E.M. Other witnesses testified that his acts and omissions endangered E.M. emotionally. Melton has not demonstrated that the trial court abused its discretion by not immediately appointing counsel.

had already occurred before this proceeding began, and the appointment of counsel would not have affected that. Despite knowing that his parental rights were under scrutiny, Melton attempted to sell drugs in 2007, was arrested, and later returned to prison. Despite having the advice of counsel, evidence showed Melton used drugs in August 2007. Melton has not shown that the trial court's failure to appoint counsel for him at the outset of this case was an abuse of discretion, deprived him of his rights, caused the rendition of an improper judgment, or prevented him from presenting his case to this Court. *See* Tex. R. App. P. 44.1(a).

Melton challenges the legal and factual sufficiency of the evidence to support the order terminating his parental rights. He challenges the findings that at least one ground supporting termination was present and that termination was in the child's best interest. A court may terminate parental rights if it finds by clear and convincing evidence that a parent has committed any of several statutory bases for termination and that termination is in the best interest of the child. *See* Tex. Fam. Code Ann. § 161.001 (West Supp. 2009); *Holley v. Adams*, 544 S.W.2d 367, 370-72 (Tex. 1976). Clear and convincing evidence is "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980). When termination is based on multiple grounds under section 161.001(1), a court of appeals must affirm the order if the evidence is sufficient to support any one of the grounds found by the district court. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

In a legal sufficiency review of a judgment terminating parental rights, an appellate court reviews all the evidence in the light most favorable to the finding to determine whether a

8

reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). To give appropriate deference to the fact-finder's conclusions and the role of a court conducting a legal sufficiency review, a reviewing court must assume that the fact-finder resolved disputed facts in favor of its finding if a reasonable fact-finder could do so. *Id.* An appellate court disregards all evidence that a reasonable fact-finder could have disbelieved or found to have been incredible. *Id.*

In a factual sufficiency review of a judgment terminating parental rights, the inquiry is whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction about the truth of the State's allegations. *Id.* A court of appeals must give due consideration to evidence that the fact-finder could reasonably have found to be clear and convincing. *Id.* A court of appeals should consider whether disputed evidence is such that a reasonable fact-finder could not have resolved that disputed evidence in favor of its finding. An appellate court can reverse for factual insufficiency only if, in light of the entire record, the evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction. *Id.*

One of the bases alleged for termination was that Melton "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *See* Tex. Fam. Code Ann. § 161.001(1)(E). To endanger is to expose to loss or injury, or to jeopardize. *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Endangerment encompasses "more than a threat of metaphysical injury or possible ill effects of a less-than-ideal environment." *Id.* The cause of the endangerment must be the direct

9

result of the parent's conduct and must be the result of a conscious course of conduct rather than a single act or omission. *In re A.S.*, 261 S.W.3d 76, 83 (Tex. App.—Houston [14th Dist.] 2008, pet. denied); *In re J.W.*, 152 S.W.3d 200, 205 (Tex. App.—Dallas 2004, pet. denied). Endangering conduct may occur either before or after the child's birth. *See In re U.P.*, 105 S.W.3d 222, 233-34 (Tex. App.—Houston [14th Dist.] 2003, pet. denied); *see also In re A.S.*, 261 S.W.3d at 83. The parent need not even know of the child's existence in order to support a finding under subsection (E). *In re J.W.*, 152 S.W.3d 200, 205 (Tex. App.—Dallas 2004, pet. denied). The statute does not require that conduct be directed at a child or cause actual harm. *Boyd*, 727 S.W.2d at 533. It is sufficient if the conduct endangers the emotional well-being of the child. *See In re U.P.*, 105 S.W.3d at 236.

The law does not require that the child be a victim of abusive conduct before the Department can involuntarily terminate a parent's rights to the child. *Dallas County Child Prot. Servs. v. Bowling*, 833 S.W.2d 730, 733 (Tex. App.—Dallas 1992, no pet.). A parent's incarceration can be a factor in termination, even though it does not alone constitute endangerment sufficient to require termination. *Boyd*, 727 S.W.2d at 533-34. A parent's illegal drug use can support termination for endangerment because it exposes the child to the possibility that the parent may be impaired or imprisoned. *Vasquez v. Texas Dep't of Prot. & Regulatory Servs.*, 190 S.W.3d 189, 195-96 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). If a parent abuses or neglects the other parent or children, that conduct can be used to support a finding of endangerment even against a child who was not yet born at the time of the conduct. *In re W.J.H.*, 111 S.W.3d 707, 716 (Tex. App.—Fort Worth 2003, pet. denied). Additionally, domestic violence, want of self-control,

and propensity for violence may be considered as evidence of endangerment. *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

The record contains testimony showing that Melton has a fairly extensive history of illegal drug use, illegal drug sales, and incarceration, some of which occurred before E.M.'s birth, continued during her life, and recurred during the pendency of this proceeding in the trial court. There is also disputed evidence that he engaged in loud verbal and physical confrontations with Norvell and Alquici Melton.

Melton was arrested in 1993 for possession of marijuana and sentenced to jail for 30 days. Court records show that in 1994, Melton was arrested for possession of marijuana and sentenced to 30 days in jail. Melton testified that he was placed on probation in 1993, but violated the terms of his release in 1997 and was incarcerated until 1999, when he was paroled. He testified that his parole was revoked later in 1999[7] and he was re-incarcerated until early 2000. Melton violated the terms of his parole by driving while intoxicated, driving with a suspended license, and resisting arrest, and was re-incarcerated in November 2000 until July 2002, during which time E.M. was born. In 2004, Melton was arrested and incarcerated for incidents in September (offenses included failure to stop and render aid, resisting arrest, evading arrest, and possession of dronabinol) and November (offenses included assault with bodily injury, tampering with physical evidence, and possession of controlled substances including marijuana and cocaine). He was paroled in October 2005. In July 2006, Melton was arrested for evading arrest, which led to his incarceration at the time of the August 2006 show-cause hearing as well as the October 2006 hearing that marked

---

[7] Melton did not specify the basis for the revocation.

11

the beginning of the legal proceedings at issue in this appeal. He was released in November 2006, but was arrested in January 2007 for evading arrest and possession of a controlled substance. The arresting officer testified that he found a vial of PCP in Melton's pants pocket and crack in his pants leg. He said Melton tried to bribe the officers to forget the charges, and asserted that he was selling drugs to fund his custody case. In November 2007, Melton was sentenced to five years in prison, where he remained through the trial. He was hoping to obtain release on parole before the end of his prison term.

Melton admitted to using illegal drugs including marijuana, PCP, and powder cocaine. He described himself as in recovery and not in need of drug treatment. He tested positive for drug use in May 2007, although he denied using drugs at that time and other testimony showed that the result could have been due to drug use any time in the previous year. He admitted using illegal drugs in August 2007, well after he was aware that his actions and the nature of his parental rights were under scrutiny. He described that event as a one-time relapse. He denied ever using drugs around E.M. Patridge testified, however, that she often picked up E.M. from Norvell's home and could tell that Melton and Norvell had been using drugs. The court appointed special advocate (CASA) volunteer testified that people often recover from PCP and cocaine addictions but the timeline is uncertain. A Department supervisor testified that illegal drug use and sales put Melton at risk of incarceration and E.M. at risk of exposure to illegal drugs, drug sellers, and associated crimes. She testified that Melton's actions threatened the stability of E.M.'s life and endangered her emotional well-being.

12

A Department investigator testified about a report of a physical confrontation between Melton and Norvell—an account that Melton disputed. The investigator testified that the report stated that, in 2002, Melton went to visit E.M. and found Norvell and her boyfriend smoking marijuana in the boyfriend's car with E.M. in the car. Melton took the child out of the car; then Norvell began struggling to gain control of the child. Norvell took the child into the house; then Melton followed her inside and attempted to retake the child. Norvell called 911, and Melton grabbed Norvell by the arms and pinned her to the couch. Melton testified that he had arguments with Norvell, but denied involving either her or E.M. physically. Patridge testified that Norvell would call her to come take E.M. away while Norvell and Melton were arguing. Patridge said that she was concerned about E.M. because of what she was seeing and because E.M. was crying a lot.

Melton similarly denied having physical altercations with Alquici Melton, but Austin police officers testified differently. Officer Shawna Griffin testified that Mrs. Melton reported on February 14, 2004, that Melton grabbed her by the jacket and pulled her upstairs, saying, "I'm going to beat your ass if you don't stop disrespecting me." Officer Deanna Lichter testified that, on February 29, 2004, officers eventually had to handcuff Mrs. Melton and guide her to the ground to control her rage in which she threatened to stab Melton. Melton was locked in the bathroom, but reported that he did not feel threatened. Officer Enrique Robledo testified that, on March 26, 2004, Mrs. Melton reported that Melton had ended an argument over money by pushing her, grabbing her, and choking her unconscious. Officer Thomas Craig testified that, on July 14, 2007, Melton's sister reported that Mrs. Melton pulled a knife while arguing with Melton about his request that she leave the house. The officer testified that Melton's hand had recently been cut.

13

Melton originally reported that he was cut when he tried to grab Mrs. Melton's knife, but later said he had cut himself cleaning haircutting clippers and did not want to press charges. All of the officers reported not seeing children present during these altercations. Mrs. Melton denied or could not recall these incidents.

Melton did not challenge Norvell's right to possess or control the choice of E.M.'s residence despite evidence that he knew Norvell was using illegal drugs and her tactic of evading his attempted visits. Melton testified that he did not know Norvell was using illegal drugs "until all this came about." The Department investigator testified, however, that Melton reported seeing Norvell smoking marijuana while sitting in a car with E.M. He also testified that Department caseworkers contacted Melton in July 2003 when investigating reports that Norvell was neglecting E.M. Caseworkers asked Melton if he knew of Norvell doing drugs, and Melton replied that he had no concerns with Norvell raising his child. The investigator said that Melton told him in 2006 that he had heard that Norvell was using drugs, but had not witnessed it. Norvell testified, however, that she and Melton used illegal drugs together. She testified that he brought marijuana, PCP, powder cocaine, and crack cocaine into her house in April 2006. Melton testified that Norvell was often evasive when he tried to visit E.M., sometimes asserting that the child was away at times he planned to visit her and sometimes disappearing with the child herself. He denied knowing that Norvell's boyfriend was reportedly a drug dealer.

Although there is no evidence that Melton ever physically injured E.M., there is sufficient evidence to support a jury finding that his acts and omissions endangered her. He repeatedly used and sold mind-altering illegal drugs, and there was evidence that he knew Norvell

14

used drugs (and that he used drugs with her), and that he left E.M. with Norvell after witnessing Norvell and her boyfriend smoking marijuana in a car with E.M. as a passenger. There was evidence that Melton thereby exposed her to drugs, to himself or others under the influence of those drugs, and to the potential of associated violence. His use and sale of illegal drugs continued even after he knew his parental rights were in jeopardy. His drug possession and other criminal actions caused his incarceration, which added to the instability of E.M.'s life. He left E.M. with Norvell, who evidence showed he knew used illegal drugs, who was repeatedly evasive regarding where the child was, and who lived with a man who Melton reportedly said used illegal drugs in E.M.'s presence. Melton engaged in a physical confrontation with Norvell about the child in the child's presence, part of which Norvell described as "tugging" over the child. Despite Melton's denials, we conclude that a jury considering the accumulated evidence could reasonably form a firm belief that Melton engaged in conduct or knowingly placed E.M. with persons who engaged in conduct that endangered E.M.'s physical and emotional well-being. The evidence is legally and factually sufficient to support an affirmative finding under section 161.001(1)(E).

The jury also found that termination of Melton's parental rights was in E.M.'s best interest. The best interest of the child is assessed using a non-exhaustive list of factors. *Holley*, 544 S.W.2d at 372. These factors include the child's wishes, her emotional and physical needs now and in the future, emotional or physical danger to the child now and in the future, the parenting abilities of the parties seeking custody, programs available to help those parties, plans for the child by the parties seeking custody, the stability of the proposed placement, the parent's conduct indicating that the parent-child relationship is improper, and any excuses for the parent's conduct.

15

*Id.* The Department need not prove all nine *Holley* factors as a "condition precedent" to termination, and the absence of some factors does not bar the fact-finder from finding by clear and convincing evidence that termination is in a child's best interest, especially when there is undisputed evidence that the parental relationship endangered the child. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). No one factor is controlling, and the facts of a case may mean that evidence of one factor is sufficient to support a finding that termination is in the child's best interest. *In re J.O.C.*, 47 S.W.3d 108, 115 (Tex. App.—Waco 2001, no pet.). Permanence is of paramount importance in considering a child's present and future emotional and physical needs. *Dupree v. Texas Dep't of Prot. & Regulatory Servs.*, 907 S.W.2d 81, 87 (Tex. App.—Dallas 1995, no pet.). A parent's statutorily offensive conduct is often intertwined with the best interest determination. *Horvatich v. Texas Dep't of Prot. & Regulatory Servs.*, 78 S.W.3d 594, 601 (Tex. App.—Austin 2002, no pet.).

Evidence of E.M.'s wishes was indirect and mixed. There was evidence that E.M. knew Melton was her father and enjoyed her visits with him. Melton's sister testified that E.M. loved her father, was jealous when others talked to him, and did not want to leave him. There was, however, testimony from Department witnesses that E.M. was not attached to Melton, that she dreaded or was resigned to the visits, and that she feared that she would be removed from Patridge's home and sent to live with Melton. The CASA volunteer testified that, after one visit, E.M. was distraught because Melton said that she would go home with him in two weeks. E.M. then asked the volunteer to attend the visit with her, but at the visit, Melton told E.M. to never ask the volunteer to stay in the room again. The volunteer and Patridge testified that E.M. was more agreeable to the visits when assured that she would return to Patridge and when given a photograph of Patridge

16

to keep with her during the visits. The volunteer testified that E.M. has moved from calling Patridge "Nana" to calling her "Mama," though she knows that Norvell is her birth mother, and that E.M. wants to live with Patridge. The evidence that E.M. was thriving physically, emotionally, and educationally in Patridge's care was undisputed.

Melton took many actions to enhance his chances to retain his parental rights. He took classes, took advice offered at visits with E.M., and obtained four counseling sessions for help with anxiety and parenting skills. He was studying to become a barber to provide for his family. Melton proposed that E.M. live with family members—if not Norvell's, then his. He offered his father, his aunt, and his sister as possible placements. He and his family emphasized E.M.'s emotional need to be with her biological family. His father and aunt are already approved by the Department as foster or adoptive homes. His father, aunt, and sister testified that they would take custody of E.M. if Melton could not now or in the future. Melton's family testified that they love E.M. Melton's wife testified that she trusts him with her daughter, who is E.M.'s age and attends the same school, and that he is her daughter's primary male role model. His sister testified that she had no concerns about him being around her young children. His father testified that Melton and E.M. have a great relationship. Melton testified that he would even relinquish his parental rights if E.M. were placed with his aunt. Dr. Poole testified that, although E.M. needs stability most now, she will be more interested in knowing her biological family as she ages.

Although Melton desired continued and increasing contact with E.M., Department witnesses testified that he did not seem to fully understand proper parent-child dynamics during visits or the effect his life choices had on his child. Melton completed Miriam Jansky's protective

17

parenting class at the Center for Child Protection in June 2007, but she testified that he did not benefit from her class because he seemed unable to look at his own life. She conceded that he wrote a letter that showed a good beginning of accepting responsibility. He also wrote an essay about parenting E.M. in his Any Baby Can parenting class that moved all listeners when he read it aloud. Dr. Poole testified that Melton was motivated to be constructive with E.M., but did not think he was prepared to take over parenting in March 2007. He did not think Melton was a physical threat to his child, but was concerned that Melton could relapse into old habits including domestic violence, incidentally causing issues for E.M. The CASA volunteer also testified that Melton's history of drug use and sales created uncertainty because of the chance of relapse. Although Melton tested negative for recent drug use in 2007, he tested positive for drug use some time in the year before May 2007 and used drugs in August 2007. Poole testified that Melton's re-incarceration underscored his concerns about Melton as a parent. The volunteer testified that, although Melton's conduct at visits improved and that he loved E.M., he failed to recognize E.M.'s needs and saw her more as an object in a struggle with Norvell and others.

The Department proposed permitting Patridge to adopt E.M. The Department caseworker described Patridge as fictive kin—someone who has a long-standing and significant relationship with the child. She further testified that the Department considers fictive kin as acceptable as blood relations when considering placement. Dr. Poole testified that young children need stable relationships more than biological relationships. Patridge was at the hospital when E.M. was born. Although Melton said he had never met Patridge and that his sister knew her as "the babysitter," Norvell testified that E.M. considered Patridge like a mother. There was testimony

that E.M. had stayed with Patridge intermittently for her whole life for periods ranging from hours to most of the summer. It was undisputed that E.M. was thriving in Patridge's care. The Department supervisor testified that removing E.M. from Patridge and placing her with an unfamiliar relative would be traumatic. The testimony was undisputed that E.M. could be adopted only if Melton's parental rights were terminated. Although Melton's relatives testified that E.M. knew them and that family was important, it was undisputed that none could approach Patridge's years of being the primary caregiver for E.M. Whether the disparity in familiarity was due to Norvell's evasiveness, Melton's incarceration and other activities, or the Department's intervention, it is undisputed that E.M. had lived in Patridge's home longer than she had stayed with Melton and all of his relatives combined. Patridge's adoption of E.M. would also allow her to continue to live with her half-brother, who had lived with Patridge most of his life. Patridge testified that she would permit E.M. to have contact with Melton so long as no drugs, violence, or fear was involved. The only negative testimony regarding Patridge concerned a home visit revealing that E.M. was sleeping on the couch because her bed was covered with items. Patridge explained that the disarray was due to reassignment of rooms following her twenty-year-old daughter's return home. The move was complete, the bed cleared, and E.M. back in her room by the follow-up home visit two weeks later.

The jury faced a difficult decision. There was evidence that Melton was trying to change his life and having some success. Melton and his family all testified that they loved and would be willing and able to care for E.M. There was also evidence that his improvement—particularly with respect to interactions with his child—was inadequate and potentially tenuous. The testimony that E.M. had been in Patridge's care throughout her life, called

19

Patridge "Mama," and thrived in Patridge's care was undisputed. Although there was testimony that bonding with biological family is important, there was also testimony that stability is important—particularly for a child E.M.'s age—and that termination of Melton's parental rights and adoption by Patridge would be the best way to promote stability and success for E.M. We conclude that the record contains legally and factually sufficient evidence permitting a reasonable jury to find that clear and convincing evidence showed that termination of Melton's parental rights was in E.M.'s best interest.

Many of Melton's remaining issues on appeal concern interim rulings the trial court made during the course of the case. Melton contends that:

> (1) the Department is required to make reasonable efforts to preserve and reunify families before removing a child from their parent and to prevent or eliminate the need for removing the child at all;
>
> (2) the trial court abused its discretion by failing to return E.M. to appellant on August 28, 2006, in the absence of any evidence required to support temporary Departmental custody, *see* Tex. Fam. Code Ann. § 262.201(b) (West Supp. 2009);
>
> (3) the trial court abused its discretion by failing to apply the correct statute prior to removing E.M. from appellant, *see id*. §§ 262.113, .205 (West 2008); and
>
> (4) the trial court abused its discretion at each hearing by failing to return E.M. to appellant in the absence of any evidence he was unwilling or unable to provide her with a safe environment, *see id*. § 263.306 (West Supp. 2009), .307 (West 2008).

Melton does not cite to any place in the record in which he objected to these alleged failings, even after he was represented by appointed counsel. He did not preserve the error for appellate review. *See* Tex. R. App. P. 33.1. Further, the allegations that the trial court failed to return E.M. to Melton ignore the undisputed fact that the Department did not remove E.M. from Melton. Melton was

20

incarcerated in March 2006 when E.M. was removed from Norvell's care and was incarcerated in August 2006 when the initial show-cause hearing was held. E.M. has never primarily resided with Melton, his blood relations, or his "fictive kin." Also, these interim orders are no longer in force, and Melton has not shown how any error in these orders caused harm that justifies reversal of the judgment terminating his parental rights. The jury found clear and convincing evidence that Melton's parental rights should be terminated. These issues present no error requiring reversal.

Melton asserts that the trial court erred by making findings of fact regarding the Department's efforts at reunifying E.M. with Melton. He has not demonstrated that these findings, even if erroneously made, merit reversal of the judgment terminating his parental rights. Termination requires particular findings, none of which distinctly address reunification. *See* Tex. Fam. Code Ann. § 161.001. The reunification issue is subsumed into the requirement to show by clear and convincing evidence that termination is in the best interest of the child. *In re N.V.D.*, 102 S.W.3d 268, 271 (Tex. App.—Beaumont 2003, pet. denied); *see also Jones v. Dallas County Child Welfare Unit*, 761 S.W.2d 103, 109 (Tex. App.—Dallas 1988, writ denied). We have concluded that the jury's finding that Melton's parental rights should be terminated is supported by legally and factually sufficient evidence. The trial court's additional findings regarding reunification efforts did not enter into our assessment of the evidence and do not require reversal of the judgment.

Melton also challenges the appointment of the Department as E.M.'s managing conservator following the termination of his parental rights. *See* Tex. Fam. Code Ann. § 161.207 (West 2008). He notes that this challenge is subsumed by his challenge to the decree of termination. *In re D.N.C.*, 252 S.W.3d 317, 318 (Tex. 2008). Because we have found that his challenge to the

21

termination decree fails, we conclude that his challenge to the appointment of the Department as managing conservator also fails.

Concluding that legally and factually sufficient evidence supports the jury's finding that Melton's parental rights should be terminated and that no other alleged error supports reversal, we affirm the judgment terminating Melton's parental rights to E.M.

_____

G. Alan Waldrop, Justice

Before Chief Justice Jones, Justices Waldrop and Henson

Affirmed

Filed:   February 25, 2010