

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-09-00382-CV

IN THE INTEREST OF T.T.F.,
A CHILD

------------

FROM COUNTY COURT AT LAW NO. 1 OF WICHITA COUNTY

------------

## OPINION

----------

## I. Introduction

Appellant S.M. appeals the trial court's judgment terminating the parent-child relationship between herself and her son, T.T.F. In four issues, S.M. contends that she was denied due process of law and that the evidence is legally and factually insufficient to support the trial court's judgment. We affirm.

## II. Background

Child Protective Services (the Department) removed T.T.F. from S.M. for the second time on March 5, 2008. The Department first removed T.T.F. in

March 2007 and returned T.T.F. to S.M. in September 2007; T.T.F. was placed with the same foster parents after each removal.

After a jury trial in September 2009, the jury found that S.M.'s parental rights to T.T.F. should be terminated, and the trial court found that S.M. had engaged in at least one activity described in subsections (D) and (E) of family code section 161.001(1) and that termination was in T.T.F.'s best interest.[1] The following witnesses testified at trial.

**Dr. Leslie Hollis**

Dr. Hollis is a board-certified pediatrician. She testified that she first saw T.T.F. on March 6, 2008, the day after his removal, and that T.T.F. was thirteen and one-half months old at the time. Dr. Hollis testified that T.T.F. was "acutely ill" but stable at the time. She said that T.T.F. had been diagnosed in February 2008 at the hospital with an ear infection, pneumonia, and RSV, which she described as "a common cold virus that can make kids wheeze." T.T.F. had been discharged from the hospital on breathing treatments to help open his airways, and Dr. Hollis testified that she could not tell whether T.T.F. had been given the breathing treatments at home. Because T.T.F.'s foster mother reported that he had not gained any weight since he was six months old, Dr. Hollis testified that she put T.T.F. on concentrated formula and asked that he return one week later to be weighed. Dr. Hollis testified that she made a working or

---

[1]*See* Tex. Fam. Code Ann. § 161.001 (Vernon Supp. 2010).

2

"rule out" diagnosis of failure to thrive at the initial visit and that she requested T.T.F.'s past medical records because failure to thrive is a "trend over time" that cannot be diagnosed on a single visit or a single weight.

Dr. Hollis testified that failure to thrive is caused by a child not receiving adequate calories for growth and that there are several reasons it occurs; it can be caused by not receiving an appropriate amount of food or calories, by the body not properly absorbing the calories given, or by a metabolic problem such as a thyroid condition. She explained that failure to thrive is dangerous because the majority of brain growth occurs in the first year of life and that failure to thrive means that the body does not have adequate calories for muscle, bone, and brain growth. She also testified that failure to thrive can cause a child to die.

Dr. Hollis testified that failure to thrive is usually diagnosed for any child whose weight falls below the third percentile, meaning that if "you line up a hundred kids their age[,] . . . they [will] weigh more than three of them and . . . less than 97 of them." Dr. Hollis testified that failure to thrive is also commonly diagnosed in children that fall from the fiftieth percentile at six months old to the third percentile at nine months old. Dr. Hollis explained, "When kids cross lines like that, that's very concerning that they're not getting adequate calories for bone and muscle growth or for brain growth."

Dr. Hollis testified that she determined T.T.F. was "around the third percentile," even though he had been at the fiftieth percentile at birth and through

his first six months.[2]  T.T.F. was thirteen and one-half months old at his initial visit with Dr. Hollis, and fully-clothed, he weighed nineteen pounds.  One week after the initial visit, without clothing and while living in foster care, T.T.F. weighed eighteen pounds, four ounces.[3]  A week later, he weighed nineteen pounds without clothing.  Over time, T.T.F. gained weight and reached a point between the tenth and twenty-fifth percentiles in July 2009.

Dr. Hollis testified that not getting enough nutrition is a non-organic cause of failure to thrive.  She testified that non-organic failure to thrive is diagnosed by removing the child from the current living situation, providing the child with adequate calories, tracking the number of calories taken in, and monitoring the child's growth.  She explained that children will typically grow very rapidly once they are given concentrated calories.  Dr. Hollis testified that, in her opinion, T.T.F. had non-organic failure to thrive caused by his environment.  Dr. Hollis testified that she could not say if T.T.F.'s failure to thrive was caused by not getting enough food, not getting the appropriate type of food, or not being given sufficient time to eat, but she agreed that all three relate to the nutrition T.T.F. was given by S.M.  And after being given the legal definition of endangerment, Dr. Hollis testified that T.T.F.'s failure to thrive meant that he had been

_____

[2]Dr. Hollis testified that T.T.F. was returned to S.M. after his first removal at about the time of his sixth month visit.

[3]Dr. Hollis testified that the drop in T.T.F.'s weight between the first and second visits was most likely attributable only to the difference between being clothed at the first visit and in only a dry diaper at the second visit.

4

endangered. She testified that T.T.F. was in danger of severe bodily injury or death at the time she first saw him in March 2008. She also testified that she considers it medical neglect for a child to lose weight or fail to gain sufficient weight such that the child weighs the same at six months and one year. And from treating T.T.F. and reviewing his records, Dr. Hollis testified that there is not a "normal" reason that T.T.F. would weigh the same at six months and one year.

Dr. Hollis testified that in addition to failure to thrive, T.T.F. had recurrent ear and sinus infections and upper respiratory infections that quickly became ear infections. Those occurred both before and during the first six months that she treated him. She explained that untreated ear infections can cause hearing loss and that children with five to six ear infections within one year are referred for surgery to have tubes placed in the ears. T.T.F. had tubes placed in his ears and has not had any ear infections after the procedure. Dr. Hollis testified that she believes it is medical neglect for a person to allow a child to develop a significant ear infection but not take the child to the doctor.

Dr. Hollis also testified that as of the time of trial, T.T.F. no longer had a failure to thrive diagnosis and was between the tenth and twenty-fifth percentile but that she could not know until much later if he would develop learning disabilities or other deficiencies associated with poor brain growth. Dr. Hollis testified that T.T.F. was "a very healthy little boy" at the time of trial.

5

**S.M.**

S.M. testified that she has never been married, that she has six children, and that T.T.F., born January 21, 2007, is the second-youngest. She also testified that T.T.F.'s father voluntarily relinquished his parental rights to T.T.F. S.M. testified that the Department initially took custody of T.T.F. in March 2007 because she made "a stupid decision" and tested positive for cocaine after getting high. Her other four children were already in the Department's custody at the time.[4]

S.M. testified that she has a large file with the Wichita Falls Police Department because she has "called the police on people a lot of times." She denied involvement in an aggravated robbery for which she was arrested and testified that the aggravated robbery charge was dismissed after investigators conducted DNA testing. However, S.M. admitted stating in a psychological evaluation that she has had problems with family violence and aggravated assault, and S.M. acknowledged that some of the incidents occurred in the presence of her children.[5] S.M. agreed that children should not be exposed to aggravated assault or family violence, but she said, "[T]hat's my past."

S.M. testified that in the ten years before trial—she was twenty-nine at the time of trial—she had only supported herself in the previous four months. She

---

[4]S.M.'s sixth child, G.J.M.B., was not born until November 2008.

[5]S.M. admitted that she had physical altercations with her friend T'Neal, her mother, and the fathers of her children.

testified that she worked at Whataburger in 2006 but "that was only like two days, so that don't even count." Otherwise, S.M. had not been employed; she lived on the child support payments made by her children's fathers. S.M. testified that she had applied to work at McDonald's, Subway, Sonic, and "everywhere" but that she could not find a job because of the aggravated robbery on her record. However, she also testified that the last time she applied for a job was before November 2008, more than ten months before trial. She said that she had not obtained her G.E.D. because she had no one to watch her youngest child while she pursued a G.E.D. S.M. also testified that Social Security has deemed her unable to work and that she receives disability payments as a result.

S.M. testified that she first became involved with the Department in May 2002 because she fainted after smoking marijuana. She admitted that her oldest child, J.K.P., was a little boy at the time and that he was with her when she fainted. S.M. also testified that in December 2005, she left her four children, J.K.P., J.G.P.K., T.M.J., and D.J.F., with a friend's neighbor while she went to Wal-Mart; the neighbor's first name was Dorothy, but S.M. did not know Dorothy's last name. S.M. testified that while she was gone, D.J.F. stopped breathing, someone called 9-1-1, and D.J.F. was taken to the hospital. S.M. testified that she subsequently learned that Dorothy was mentally ill; S.M. said that she "felt so stupid" for leaving her children with an inappropriate caregiver she did not know.

7

Beginning in August 2007, S.M.'s children were returned to her, but the Department maintained legal custody of her children. However, S.M. testified that she moved about seven times between August 2007 and March 2008 and that she knew that she was supposed to tell the Department where she was living, but she did not tell the Department each time that she moved. She did say, however, that caseworker Tammy Durham visited her regularly during that time and almost always knew where she was. S.M. testified that she was effectively homeless during this period; she was not on the street, but she moved from house to house without paying rent. She testified that she had just been released from jail but that the aggravated robbery arrest was still on her record, so she could not get a job. S.M. testified that she did not want to live that way and that she was doing the best she could under the circumstances.

S.M. testified that her food stamps lapsed in October 2007 and that she had not reinstated them by March 2008. She said that the Department provided her with food, clothes, and sleeping bags "a lot" of times during this period. S.M. also testified that her Medicaid lapsed in October 2007 and that she did not take her children to the hospital or doctor between October 2007 and March 2008 other than to take T.T.F. to the hospital in February 2008. S.M. testified that she was "irresponsible" for allowing her Medicaid and food stamps to lapse and that it hurt her ability to provide food for her children. S.M. also testified that T.T.F. was late in receiving his immunizations because she had allowed her Medicaid to lapse.

S.M. testified that she took T.T.F. to the hospital in February 2008 because he was sick. She said that she fed T.T.F., but she admitted that she had noticed that T.T.F. was not getting any bigger and that she did not take him to the hospital to determine if there was a problem. S.M. testified that she decided to take T.T.F. to the hospital because he was not acting normally; he was just lying around and not crawling, bouncing up and down, or babbling as he would normally do. She said that T.T.F. had pneumonia and an ear infection, that he was in the hospital for three days and that the hospital released him with a prescription for infections, but no one mentioned his weight or a need to change his formula intake. S.M. would not agree that T.T.F. had actually suffered from failure to thrive, stating that she wanted a second opinion on the matter.

S.M. testified that she was living in a home on Cleveland Street with her children and her friend, T'Neal, in early March 2008 and that her caseworker, Durham told her to clean up the house they were living in. S.M. testified that she had called Durham, the morning that she moved in to give her the address and that Durham came to the house that morning and took pictures. S.M. agreed that the house needed to be cleaned, but she testified that she did not have anywhere else to go. She agreed that there were boards with exposed nails in the dining room and that dirt covered some of the floors. S.M. said that Durham told her she would return the next day, that she instead returned the same day without giving her time to clean the house, and that Durham removed the children when she returned. S.M. testified that the police accompanied Durham

9

at the removal because she had previously told Durham that she would "have a fight on her hands" if she tried to remove her children.

S.M. testified that Linda Johnson is her current caseworker. S.M. admitted to yelling at Johnson and hanging up on Johnson many times, most recently within two months of trial. S.M. also admitted that she slammed a door at the visitation center, but she denied breaking the door. S.M. also denied that the Department's refusal to provide her with transportation is related to any threats she made to Department employees. S.M. did say, however, that she gets emotional and has yelled "a couple of times" when she was crying.

S.M. testified that she attended and completed parenting classes and counseling through the Christian Women's Job Corps after her children were removed in March 2008. She also said that she prepared written budgets with Johnson and obtained social security benefits to comply with the court's order that she obtain a legal source of income.[6]

S.M. testified that she found a permanent place to live for the first time when she moved to the mission; she was pregnant with her youngest child, G.J.M.B., at the time. She also testified that the Department was granted a non-

---

[6]S.M. testified that she qualified for disability payments because of a "personality disorder, a learning disability." She said that she has been told that she is "borderline intellectual functioning," which means that it is difficult for her to understand sophisticated needs like the needs of a child. S.M. also testified that she takes Depakote, a bipolar mood stabilizer, and Cymbalta, an antidepressant.

10

emergency removal of G.J.M.B. and appointed as G.J.M.B.'s managing conservator but that the court ordered the Department to return G.J.M.B. to her.

S.M. testified that she met several people at the mission who helped her with her pregnancy, her physical needs, and her spiritual needs, and they provided her with a home. After G.J.M.B. was born, the mission provided S.M. with a private family room in which S.M. and G.J.M.B. did not have other roommates. S.M. continued to live at the mission with G.J.M.B. for approximately six months, and the mission provided S.M. with shelter, a baby bed, diapers, baby wipes, and most of G.J.M.B.'s clothes. S.M. testified that she was told that she could stay at the mission as long as she needed to and that she stayed at the mission until the summer of 2009. She also testified that the Department again tried to remove G.J.M.B. when she moved into her current house but that the court dismissed the case and allowed her to live at the new house with G.J.M.B.

S.M. testified that she learned age-appropriate discipline techniques for her children in parenting classes. She said that she has shown more patience with her children during visitations and has, as required by her service plan, avoided outbursts.[7] S.M. also testified that her service plan required her to stay drug-free and that her last positive drug test was in 2007 when T.T.F. was approximately three months old. She testified that she is not drug-tested

_____

[7]S.M. testified that she never yelled at her children during visitations and said that this requirement of her service plan was a "precaution."

anymore and that she no longer uses drugs. She also testified that she had, as required, allowed announced and unannounced home visits and that she had maintained housing that is clean, safe, and free of any hazards. Her service plan also required her to maintain a pattern of stability for at least four months, and she testified that she had been in the same house for almost four months.

S.M. additionally testified that she has remained current with her different government programs and that she has done so since G.J.M.B. was born. She also testified that her doctor told her that G.J.M.B. does not have any developmental difficulties and that G.J.M.B. is healthy and growing.

S.M. testified that she has visitation with her children for one hour each Thursday, that she looks forward to the visitations, and that she has not missed any visitations. S.M. testified that J.K.P. and D.J.F. are angry with her; she said that D.J.F. does not really know her. S.M. also testified about the ages and status of custody of each of her children as of the time of trial. J.K.P is ten years old, and the Department is J.K.P.'s permanent managing conservator. J.G.K.P. is six years old, and the Department is J.G.K.P.'s temporary managing conservator. T.M.J. is five years old, and the Department is T.M.J.'s permanent managing conservator. D.J.F. is three years old, and the Department is D.J.F.'s permanent managing conservator. G.J.M.B. is ten months old, and S.M. has full legal custody of G.J.M.B.

S.M. testified that the Department had requested, and she had agreed, that the Department should be the permanent managing conservator of J.K.P.,

12

T.M.J., and D.J.F.  She testified that it was a difficult decision, that she was still homeless at the time, that she could not provide a stable home for her children at the time, and that she "did what was best for [her] kids."  S.M. testified that she loves all of her children "very dearly," that she hopes her children can forgive her, that she wants all of them back, and that she wants to go to family counseling with all of them.

S.M. testified that the court ordered her to follow through on her application for disability payments, and she said that she received a lump sum payment in excess of $2,000 and monthly payments of $675 that began in June 2009.  S.M. used the money to find a place to stay.  S.M. testified that she pays $500 per month in rent and that all of her bills are paid.  The remaining $175 per month goes to pay for her cell phone and to purchase diapers, baby wipes, and toiletries; she purchases food with food stamps.  S.M. testified that she has looked into moving to the Housing Authority and that she only needs G.J.M.B.'s social security card before she can move there.  She testified that she could stay in her current house but that the Housing Authority will be a much lower rental amount.

S.M. testified that she wants to get T.T.F. back.  She testified that as of the time of trial she lives in a one-bedroom apartment and that she does not have a baby bed for nine-month-old G.J.M.B., who sleeps in the bed with her, but that she will buy a bed for T.T.F.  However, when asked how she could purchase a bed for T.T.F., S.M. stated, "I got God on my side and all of that will work out."

13

She testified that she will walk or take the bus to deliver T.T.F. to his medical appointments and that she will pay for his medication and food using Medicaid and food stamps.

**Tammy Durham**

Durham testified that she first became S.M.'s caseworker in February 2007.[8]  Durham testified that the Department decided in August or September 2007 to return S.M.'s children to her; the Department maintained custody of the children but planned to transition one or two children back to S.M. at a time.[9] S.M. was living with her mother at the time, and Durham visited the house weekly; there was food in the home, and the children seemed to be adequately cared for.

Durham testified that she first began having reservations about S.M.'s instability—moving from place to place and not having food for her children—in October 2007.  Durham said that she conducted house visits near the time and that the home was normally calm in the mornings but that the children were rambunctious in the afternoons.  Durham testified that S.M. yelled and screamed at her children several times and that she spoke to S.M. about it.  Durham said

---

[8]T.T.F. was born in January 2007, and all of S.M.'s other children were already in the Department's custody at the time.  T.T.F. was removed for the first time in March 2007.

[9]Durham testified that the Department placed the three oldest children with S.M. in August 2007 and placed the two youngest with S.M. near the end of September 2007.

that she asked for removal during the fall of 2007 but that her supervisors said that not enough had occurred to warrant removal.[10]   Her concerns were alleviated in January 2008 when S.M. moved into a house on Gerald Street with G.J.M.B.'s father, G.B.  Durham testified that she became concerned again, however, when S.M. moved again at the end of January 2008.

Durham testified that she had numerous conversations with S.M. about the need to become self-sufficient and to provide her children with basic necessities. However, Durham testified that S.M.'s attitude was that it was the Department's responsibility to make sure that the children had basic necessities.  Durham testified that the Department provided S.M. with food, car seats, playpens, diapers, formula, clothes, beds, sleeping bags, pillows, school uniforms, and school supplies.  She said that the Department also provided transportation to S.M. on numerous occasions, including transportation to visitations, to enroll J.K.P. in school, to take J.K.P. to school, to get Social Security cards, and to doctor's appointments, but according to Durham, the Department stopped providing S.M. with transportation after S.M. threatened her.[11]

Durham also testified about the house on Cleveland Street where S.M. lived in March 2008.  She testified that she first visited the house on March 4 and

---

[10]On cross-examination, Durham acknowledged that her supervisors' refusal to agree to removal indicated that the circumstances were satisfactory at the time.

[11]However, the Department then began providing bus passes to S.M.

15

that she discussed the problems with the house with S.M. on March 4 and told her that the house had to be cleaned. Durham testified that she saw rat feces (not clumps of dirt) on the floor, feces on the door, boards with exposed nails, and rotten chicken on the counter; she said that the kids appeared to have not been bathed and smelled "very unclean."[12] Durham testified that when she returned on March 5, some things in the house had been cleaned—the majority of the rat feces was gone—but feces on the door, nails in boards in the living room, general clutter in the house, and rotting food on the counter remained. Durham testified that the Cleveland Street house was an "endangering surrounding" for T.T.F.[13]

Durham said that the children were removed the evening of March 5. She had police attend the removal because S.M. had threatened her in the past, and she testified that although S.M. did not physically fight her, S.M. screamed at her from the porch and threatened to "come out and shoot" her. Durham acknowledged that S.M. brought the children to her from the house after the police diffused the situation. However, Durham also testified that S.M. left a voicemail for her the day after the removal threatening to "make her pay."

---

[12]S.M. denied that feces were smeared on a door and wall, that rat feces were on the floor, that her children were dirty, and that they smelled unclean.

[13]Dr. Hollis testified that she considers it endangerment for T.T.F. to have been in conditions with rat feces on the floor, boards with exposed nails, floors covered with dirt, doors smeared with feces, and rotten food on counter tops.

Durham testified that she learned of T.T.F.'s failure to thrive diagnosis the day after the removal when T.T.F.'s foster parents took him to visit Dr. Hollis. Durham testified that she spoke with S.M. about the failure to thrive diagnosis but that S.M. screamed at her; Durham said that S.M. would not allow her to discuss what might have caused T.T.F.'s condition and that S.M. did not seem to comprehend the dangers of a failure to thrive diagnosis.

Durham testified that Johnson became S.M.'s caseworker shortly after S.M. threatened her. On cross-examination, Durham acknowledged that she might yell at someone if he or she took away her own children, that it would be an upsetting situation, and that S.M. apologized to her three or four months later. Durham also testified that S.M. had not assaulted her or any Department workers and that she was not aware of any allegations of S.M. physically abusing her children.

Durham testified that S.M. was drug-tested while she was S.M.'s caseworker; S.M. had a positive test shortly after T.T.F.'s birth and another positive test in October 2007. Durham testified that she did not learn about the October 2007 positive test result until much later and that she would have had the children removed had she learned about it in a timely manner. However, Durham acknowledged that drugs have not been "an everyday problem" for S.M. Durham also testified that S.M.'s current situation is better than it was when T.T.F. was removed in March 2008.

**Linda Johnson**

Johnson testified that she became S.M.'s caseworker in March or April 2008. Johnson said that S.M. does not often miss visitations but that if she does, she wants to schedule a makeup visitation. Johnson testified that she has observed a lot of S.M.'s visitations with her children and that S.M. has had outbursts with her children that are more than "stern talking." Johnson acknowledged that S.M. has progressed in this area and that S.M. does not yell directly at her children like she used to do, but Johnson said that S.M. still yells at Department staff when she does not get what she wants.

Johnson also testified that she has seen J.K.P. and D.J.F. leave the room during visitations and wander the hall or go into other visitation rooms. Johnson said that she does not think that either J.K.P. or D.J.F. have ever remained in the visitation room for the entire hour of visitation. Johnson also testified that J.K.P. takes care of T.T.F. if T.T.F. becomes upset during the visitations while S.M. sits on the couch. Johnson additionally testified that T.T.F. sometimes has "meltdowns" and does not want to go to visitation. But Johnson admitted that she has witnessed T.T.F. run to his mother at visitation and tell her that he loves her.

Johnson testified that she visited S.M. at the mission after G.J.M.B.'s birth. Johnson agreed that the mission provided for S.M.'s and G.J.M.B.'s needs but said that permanency was the problem. Johnson also testified that she has seen S.M. with G.J.M.B., that G.J.M.B. has bonded with S.M., that S.M. "appear[ed] to

18

be a good mother" to G.J.M.B., and that, at the time of trial, G.J.M.B. was doing well. Johnson also agreed that S.M.'s current house was adequate, that the refrigerator and cabinets were stocked with food, and that S.M. had adequately furnished the house. Johnson conceded that S.M.'s situation was better at the time of trial than in March 2008 and that, at the time of trial, S.M. had her own lease and was paying her own bills.

Johnson testified that she has had conversations with S.M. about the need to become self-sufficient. Johnson said that S.M. told her she could not get a job because of the aggravated robbery charge, but Johnson also said that she is aware of other parents with criminal histories who have been able to find employment. Nevertheless, Johnson agreed that it would probably be "a black mark to an employer" if you disclose that you have been arrested for aggravated robbery. Johnson also testified that she told S.M. about the Helen Farabee Center and that the Center works with people who are on disability to find minimal employment so that they do not lose their disability benefits; she testified that a person referred to the Center is likely to be placed in a job. Johnson testified that S.M. said she would take advantage of the Center's program but that S.M. did not show up for her appointment. Johnson testified that S.M. became involved with Christian Women's Job Corps after May 2008 and that she sometimes saw improvement in S.M.'s attitude after that time, but Johnson testified that the improvement did not last long.

19

Johnson testified that T.T.F.'s foster parents have expressed a desire to adopt him. The foster parents have one grown daughter and two other daughters living in their home, and their children interact with T.T.F. Johnson said that the foster parents treat T.T.F. as one of their own children and that they do not treat T.T.F. differently than their own children. J.K.P. is also living with the same foster parents. Johnson testified that the placement has been "really, really positive" and that T.T.F. was "very happy and bouncing around because [J.K.P.] came to live at the same home."[14] Johnson testified that the foster parents' home is stable and appropriate.

Johnson testified that, if S.M.'s rights are terminated, the Department plans to have T.T.F. tested for any problems caused by his failure to thrive. However, she said that, as of the time of trial, T.T.F. "looks great" and that there is nothing physically wrong with him. T.T.F. initially had speech problems, but is now talking well after speech therapy. T.T.F. has also had behavioral therapy for problems with outbursts, partly based on Dr. Hollis's observations about "intermittent explosive disorder," but Johnson said that it is too early to make any diagnosis.

Johnson testified that S.M. has only had a stable home for less than four months out of her eleven years as an adult. Johnson testified that S.M. is doing better but that her period of stability does not change the danger that T.T.F. was

_____

[14]The record does not reflect whether there is a plan to keep J.K.P. with T.T.F.

20

in while in S.M.'s care, such as failure to thrive and dangerous living conditions. Johnson testified that it would not be in T.T.F.'s best interest for S.M. to be his managing conservator. She also testified that it would be in T.T.F.'s best interest if S.M.'s rights were terminated.

**Timothy Veal**

Timothy Veal is a licensed minister and is the program director at Faith Mission. Veal testified that S.M. was pregnant when she first moved to the mission and that she gave birth to G.J.M.B. during the time she lived at the mission. Veal testified that S.M. followed the mission's rules while she was there, that she was not asked to leave, that she was "very diligent" in taking care of G.J.M.B., and that she was a nurturing, good mother to the child. Veal also testified that S.M.'s current situation is an improvement over her life at the mission.

**Patrick Barber**

Patrick Barber is a Department investigator who investigates reports to determine if children are safe. Barber has investigated "a couple" of cases involving S.M., the most recent of which concerned G.J.M.B. The hospital staff knew about S.M.'s history with the Department, and it concerned them enough that they called the Department once G.J.M.B. was born. In response, Barber visited S.M. at the hospital and talked with her about the Department's concerns and possible placement of G.J.M.B. with a relative. Barber also testified that he observed S.M. with G.J.M.B. and that she seemed to be doing okay with

21

G.J.M.B. Barber visited with S.M. about a week later at the mission and observed that the mission was a safe environment for G.J.M.B. Barber testified that he did not believe that G.J.M.B. was in immediate danger and that he did not believe removal was warranted at that time.

**Mauri Reed**

Mauri Reed serves as a court-appointed special advocate (CASA). She is the advocate for T.T.F. and J.K.P., and she previously served as the advocate for G.J.M.B. Reed testified that she has a bachelor's degree in social work with a specialty in child development and that she is certified as an advocate through Texas CASA. Reed stated that when a child is removed from their parent, the child is given an advocate or a guardian ad litem. Reed testified that the advocate will not always agree with the Department about the child's best interests but that an advocate's goal is to determine what is best for the child. Reed testified that termination is in T.T.F.'s best interest and that appointing the Department as T.T.F.'s permanent managing conservator is not in T.T.F.'s best interest.

Reed testified that she has observed S.M.'s visitations with her children. She has observed that S.M. loves her children, that the children are reluctant to go to visitation at times, that the children run in and out of the visitation room, that the children interact and play with one another, that one child rarely stays in the room, that S.M. and the children read books, and that visitation is at times chaotic.

22

Reed testified that when T.T.F. returned to his foster parents in March 2008, he was hesitant of strangers, he cowered over his food, and he had different attributes than the "happy-go-lucky," thriving child that left the foster parents' home six months earlier. In contrast, Reed testified that by the time of trial, T.T.F. was very attached to his foster mother and that he loves his foster father as well. She testified that T.T.F. feels safe with the foster parents and that he has bonded with them. Reed stated that since J.K.P. lives with T.T.F. and his foster parents now, J.K.P. reads books to T.T.F., and the bond between J.K.P. and T.T.F. has strengthened. Reed also said that T.T.F. has a regimented ritual in the evenings near bedtime.

Reed testified that the foster parents would like to adopt T.T.F. She stated that the foster parents adore T.T.F., that T.T.F. has made their home complete, that they love him dearly after having kept him for so long, that they know the things he struggles with, and that his foster mother has learned very well to calm him down and manage his angry outbursts. She also said that T.T.F. is learning the words necessary to express himself and to say why he is mad. Reed described T.T.F.'s foster mother as observant and very willing to get T.T.F. the help that he needs. She testified that T.T.F.'s foster mother tends to his medical needs, that she would be attentive to any medical emergency that he might experience, that she helped him regain his health after he was diagnosed as failure to thrive, and that she has done an excellent job with T.T.F.

## III. Due Process

In her first issue, S.M. contends that the trial court and the Department violated her procedural due process rights in eight ways.

### A. Retention of Suit on Docket for Extraordinary Circumstances

S.M. argues that her due process rights were violated because the trial court did not conduct a hearing before retaining the case on the docket beyond the initial one-year dismissal date. The Department responds that family code section 263.401 does not require the trial court to conduct a hearing before retaining a case on the docket for extraordinary circumstances.

In relevant part, family code section 263.401 states:

(a) Unless the court has commenced the trial on the merits or granted an extension under Subsection (b), on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator, the court shall dismiss the suit affecting the parent-child relationship filed by the department that requests termination of the parent-child relationship or requests that the department be named conservator of the child.

(b) Unless the court has commenced the trial on the merits, the court may not retain the suit on the court's docket after the time described by Subsection (a) unless the court finds that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child.

Tex. Family Code Ann. § 263.401(a), (b) (Vernon 2008).

We strictly construe statutes concerning involuntary termination of parental rights in favor of parents. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re*

24

*A.V.*, 849 S.W.2d 393, 400 (Tex. App.—Fort Worth 1993, no writ). Our primary objective in construing a statute, however, is to determine and give effect to the legislature's intent. *Phillips v. Beaber*, 995 S.W.2d 655, 658 (Tex. 1999). In determining the legislature's intent, we look first to the statute's plain and common meaning and presume that the legislature intended the plain meaning of its words. *Fleming Foods v. Rylander*, 6 S.W.3d 278, 282 (Tex. 1999). We also presume that the legislature chose its words carefully, recognizing that every word in a statute was included for some purpose and that every word excluded was omitted for a purpose. *In re M.J.M.L.*, 31 S.W.3d 347, 354 (Tex. App.—San Antonio 2000, pet. denied); *Renaissance Park v. Davila*, 27 S.W.3d 252, 256 (Tex. App.—Austin 2000, no pet.).

S.M. argues that the trial court violated her procedural due process rights by not conducting a hearing before granting an extension for extraordinary circumstances, but the plain language of section 263.401 does not require the trial court to conduct a hearing before granting an extension. *See* Tex. Fam. Code Ann. § 263.401(a), (b). Thus, we must presume that the legislature did not intend to require a hearing before the trial court retains a case on its docket pursuant to section 263.401(b). *See id.* § 263.401(b); *M.J.M.L.*, 31 S.W.3d at 354; *Renaissance Park*, 27 S.W.3d at 256. Moreover, we note that this court has previously held that section 263.401(b) does not require a written extension order and that an oral rendition is sufficient. *See In re J.L.C.*, 194 S.W.3d 667, 672 (Tex. App.—Fort Worth 2006, no pet.). Finally, we note that the trial court signed

the order retaining the case on the docket on March 30, 2009, that the trial court conducted a permanency hearing the same day, and that the trial court's permanency hearing order reflects that S.M. and her counsel attended the permanency hearing in person. We hold that the trial court did not violate S.M.'s procedural due process rights by not conducting a hearing before retaining the case on the docket beyond the one-year dismissal date.

S.M. also argues that the trial court denied her procedural due process rights by retaining the case on the docket beyond the initial dismissal date because extraordinary circumstances did not exist to justify the retention. The trial court found that extraordinary circumstances justified retention because it could not set the case for a jury trial until a date beyond the one-year dismissal date.

The one-year dismissal date in this case was April 6, 2009. The case was originally set for trial on February 10, 2009, but the Department filed a motion for continuance on February 3, 2009, asking that the case be set for a jury trial. The Department's motion asked that the case be set for trial no later than the one-year dismissal date, and S.M. did not oppose the Department's motion. On February 5, 2009, the trial court granted the Department's motion but set the case for a jury trial to begin on June 9, 2009, a date beyond the one-year dismissal date. Then, on the day of the March 30, 2009 permanency hearing, the trial court signed an order retaining the case on the docket beyond the one-year dismissal date. The trial court's order included a finding of extraordinary

26

circumstances and stated, "An order to retain the case on the Court's docket should be granted for the reason that the Court could not set the jury until June 2009 which is after the one year dismissal date."

"Because an extension of the dismissal date is similar to a continuance and because section 263.401(b) does not indicate which appellate standard of review to apply, we apply the abuse of discretion standard." *In re D.W.*, 249 S.W.3d 625, 647 (Tex. App.—Fort Worth 2008, pet. denied) (citing *In re J.A.*, No. 02-05-00454-CV, 2006 WL 3114434, at *9 (Tex. App.—Fort Worth 2006, no pet.) (mem. op.)). To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620.

Here, the Department requested that the case be continued from the original February 10, 2009 trial setting so that it could be tried before a jury, and S.M. did not oppose the Department's motion. The trial court granted the unopposed motion for continuance but found that the case could not be set for a

27

jury trial until June 2009, beyond the one-year dismissal date.[15] First, S.M. does not argue or cite to any portion of the record to suggest that the trial court had another available date for a jury trial before the one-year dismissal date. Thus, we cannot conclude that the trial court acted arbitrarily or capriciously. Second, S.M. does not argue that she was harmed by the trial court's retention of the case beyond the one-year dismissal date. Indeed, the delay permitted S.M. to present evidence to the jury that she had maintained a stable home in the four months before trial, evidence that she could not have presented to the jury before the April 6, 2009 one-year dismissal date. *See Melton v. Tex. Dep't of Family & Protective Servs.*, No. 03-08-00168-CV, 2010 WL 668917, at *2 (Tex. App.—Austin Feb. 25, 2010, no pet.) (mem. op.) (holding that the appellant failed to establish harm from the trial court's failure to dismiss the suit within the one-year deadline). Thus, we hold that the trial court did not abuse its discretion by retaining the case on its docket beyond the initial one-year dismissal date. We overrule this portion of S.M.'s first issue.

## B. Not Reducing Temporary Order to Writing Following Adversary Hearing

S.M. also argues that the trial court violated her procedural due process rights by failing to issue a written temporary order following the April 24, 2008 adversary hearing. Specifically, S.M. contends that the order rendered orally by

---

[15]The trial actually commenced in September 2009 after S.M. moved to continue the June 2009 trial setting and objected to an August 2009 trial before an associate judge.

28

the trial court at the conclusion of the April 24, 2008 adversary hearing "did not set out the terms and conditions by which [she and T.T.F.'s father] were to obtain return of the child."

Family code section 262.201(a) requires the trial court to conduct a full adversary hearing no later than fourteen days after the governmental entity takes possession of the child. Tex. Fam. Code Ann. § 262.201(a) (Vernon Supp. 2010). Section 262.201(b)(1) requires the trial court to order the child returned unless the court finds sufficient evidence of (1) a danger to the child's physical health or safety that "was caused by an act or failure to act of the person entitled to possession" and that "for the child to remain in the home is contrary to the welfare of the child." *Id.* § 262.201(b). In this case, S.M.'s counsel stipulated at the April 24, 2008 adversary hearing "that there is a danger to the physical health and welfare to the child caused by the party in possession's failure to act."

S.M.'s complaint is that the trial court did not issue a written order setting forth the terms and conditions under which she could regain possession of T.T.F. But section 262.201 did not require the trial court to issue an order following the adversary hearing that sets forth the terms and conditions under which she could regain possession of the child. *See generally id.* § 262.201(a)–(g). Therefore, we hold that the trial court did not violate S.M.'s procedural due process rights by failing to issue a written order setting forth the terms and conditions under which S.M. could regain possession of T.T.F. We overrule this part of S.M.'s first issue.

29

## C. Separate Trials

S.M. next contends that the trial court consolidated this case with a different case involving another of her children but denied her right to procedural due process by subsequently conducting separate trials. She argues that her rights were prejudiced by the trial court's failure to conduct a single trial. The Department argues that the two cases were never actually consolidated, but we assume without deciding that the two cases were consolidated and subsequently severed.

A severance splits a single suit into two or more independent actions, each action resulting in an appealable final judgment. *Van Dyke v. Boswell, O'Toole, Davis & Pickering*, 697 S.W.2d 381, 383 (Tex. 1985); *Aviation Composite Techs., Inc. v. CLB Corp.*, 131 S.W.3d 181, 188 (Tex. App.—Fort Worth 2004, no pet.). Severance of claims under the Texas Rules of Civil Procedure rests within the sound discretion of the trial court. *Liberty Nat'l Fire Ins. Co. v. Akin*, 927 S.W.2d 627, 629 (Tex. 1996) (orig. proceeding); *Aviation Composite Techs.*, 131 S.W.3d at 188. The controlling reasons for a severance are to do justice, avoid prejudice, and further convenience. *Guar. Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 658 (Tex. 1990) (op. on reh'g); *Aviation Composite Techs.*, 131 S.W.3d at 188.

The Department argues that S.M. has not provided any support for her contention that her rights were prejudiced by conducting separate trials. We agree. In the trial court, S.M.'s counsel merely stated: "I believe that these two

30

cases should be tried together, and I believe it prejudices my client's rights to have them tried separately considering that the Court did order that they be tried together." And in her brief in this court, the totality of S.M.'s prejudice argument states: "By Order of the referring Court, the two causes were to be tried jointly, and without such joint trial, [S.M.'s] rights were prejudiced." S.M. made no other argument concerning prejudice in the trial court, and she makes no other argument concerning prejudice in this court. *See* Tex. R. App. P. 38.1(h) (requiring a clear and concise argument with appropriate citations to legal authorities); *see also Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284 (Tex. 1994) (noting long-standing rule that a point may be waived due to inadequate briefing). Thus, because the severance of claims rests within the sound discretion of the trial court, because the primary reasons for a severance are to do justice, avoid prejudice, and further convenience, and because S.M. has not established any prejudice she suffered from separate trials, we hold that the trial court did not abuse its discretion by conducting separate trials. We overrule this portion of S.M.'s first issue.

## D. No Signed Service Plan within Forty-Five Days of Adversary Hearing

S.M. also argues that her procedural due process rights were violated because the Department did not obtain her signature on the service plan it filed after the April 24, 2008 adversary hearing. She contends that the service plan was not effective until she reviewed and signed it with the caseworker on

31

October 2, 2008, and that the delay deprived her of four months of time to work on the service plan.

Family code section 263.101 requires the Department to file a service plan no later than the forty-fifth day after the trial court renders a temporary order appointing the Department as the temporary managing conservator. Tex. Fam. Code Ann. § 263.101 (Vernon 2008). Section 263.103(c), however, permits the Department to file the service plan without the parent's signature if it "determines that the child's parents are unable or unwilling to sign the service plan." *Id.* § 263.103(c) (Vernon 2008). Section 263.103(d)(2) in turn provides that the service plan takes effect when the Department "files the plan without the parents' signatures." *Id.* § 263.103(d).

In this case, the Department filed the service plan with the trial court on April 29, 2008, five days after the April 24, 2008 adversary hearing. Johnson testified that the Department filed the service plan without S.M.'s signature because S.M. had been volatile when the Department removed T.T.F. Johnson also testified that she mailed the service plan to S.M.'s attorney at the end of April, that S.M. called her on May 18, 2008, and said that she had reviewed the service plan with her attorney, and that Johnson set appointments for S.M. with a counselor and Family Circle Services as soon as S.M. called her to say that she had gone over the service plan with her attorney. Thus, S.M.'s contention that she was denied four months of valuable time to work her service plan is without merit. The service plan took effect when the Department filed it without S.M.'s

32

signature on April 29, 2008, S.M. was aware of the service plan's requirements within forty-five days of the April 24, 2008 adversary hearing, and Johnson scheduled appointments for S.M. shortly thereafter. On these facts, we hold that the filing of the service plan without S.M.'s signature did not violate S.M.'s procedural due process rights. *See id.* §263.103(c), (d). We overrule this part of S.M.'s first issue.

### E. Untimely Status and Permanency Hearings

S.M. also argues that the trial court violated her procedural due process rights by not conducting a status hearing within sixty days of the April 24, 2008 temporary order, by not conducting an initial permanency hearing within 180 days of the April 24, 2008 temporary order, and by not conducting subsequent permanency hearings within 120 days of each permanency hearing.

Family code section 263.201(a) requires the trial court to "hold a status hearing to review the child's status and the service plan developed for the child" no later than sixty days after the court renders a temporary order appointing the Department as temporary managing conservator of the child. Tex. Fam. Code Ann. § 263.201(a) (Vernon 2008). Similarly, section 263.304(a) requires the trial court to conduct an initial permanency hearing within 180 days of the temporary order. *Id.* § 263.304(a) (Vernon 2008). Finally, section 263.305 requires the trial court to conduct subsequent permanency hearings within 120 days of the most recent permanency hearing. *Id.* § 263.305 (Vernon 2008). It is undisputed that the trial court did not conduct a status hearing within sixty days of the temporary

order, the initial permanency hearing within 180 days of the temporary order, or subsequent permanency hearings within 120 days of the most recent permanency hearings. However, it is also undisputed that the trial court did conduct a status hearing, an initial permanency hearing, and a subsequent permanency hearing.[16]

In a slightly different context, this court held in *In re E.D.L.*, 105 S.W.3d 679, 688 (Tex. App.—Fort Worth 2003, pet. denied), that although family code section 262.201(a) requires a trial court to conduct a full adversary hearing within fourteen days of the date a governmental entity takes possession of a child, the requirement is procedural, not jurisdictional. In part because section 262.201 does not contain a remedy for failing to conduct a full adversary hearing in a timely manner, we held that the failure to timely conduct a full adversary hearing did not require dismissal of the termination proceeding. *See id.* at 686–88. We also held that both the Department and the parent had "the right to compel the trial court by mandamus to conduct the adversary hearing promptly." *Id.* at 688.

Although S.M. contends that her procedural due process rights were violated and does not ask us to hold that the trial court should have dismissed the case once it did not timely conduct a status hearing, an initial permanency

---

[16]The parties agree that the trial court rendered its temporary order at the April 24, 2008 adversary hearing but did not conduct a status hearing until October 2, 2008, did not conduct the initial permanency hearing until November 4, 2008, and did not conduct a subsequent permanency hearing until March 30, 2009.

hearing, or subsequent permanency hearings, we believe the reasons for our holding in *E.D.L.* apply in this case. Sections 263.201 and 263.305 do not contain remedies for the failure to timely hold a status hearing or a subsequent permanency hearing, and section 263.304(b) specifically provides that any party to the suit may compel the trial court, by mandamus, to comply with its obligation to conduct an initial permanency hearing within the statutory deadline. *See* Tex. Fam. Code Ann. §§ 263.301, .304(b), .305. Thus, under the plain language of section 263.304(b) and the reasoning in *E.D.L.*, S.M. could have sought to enforce her procedural right to a timely status hearing, a timely initial permanency hearing, and timely subsequent permanency hearings by mandamus. *See* Tex. Fam. Code Ann. § 263.304(b); *E.D.L.*, 105 S.W.3d at 688. But S.M. did not seek mandamus relief or otherwise complain to the trial court in a timely manner about its failure to conduct the hearings. *See In re N.V.D.*, 102 S.W.3d 268, 269–70 (Tex. App.—Waco 2003, pet. denied) (acknowledging the trial court's failure to timely conduct a subsequent permanency hearing, noting that the parent did not seek mandamus and that the trial court conducted the subsequent permanency hearing as soon as the delay was brought to its attention, and holding that the error was harmless because the parent did not demonstrate that the error probably caused the rendition of an improper judgment). Thus, S.M. cannot complain on appeal that she was denied procedural due process in the trial court when she did not seek to enforce her procedural rights in a timely manner in the trial court. *See id.*

35

Moreover, S.M. has also failed to show that she was harmed by the trial court's failure to timely conduct the status hearing, the initial permanency hearing, or the subsequent permanency hearings. Indeed, she makes no argument at all concerning harm, and she makes no complaint concerning anything that occurred at the status hearing, the initial permanency hearing, or the subsequent permanency hearing. "[T]he remedy for a denial of due process is due process." *Univ. of Tex. Med. Sch. at Houston v. Than*, 901 S.W.2d 926, 933 (Tex. 1995) (citing *Perry v. Sindermann*, 408 U.S. 593, 603, 92 S. Ct. 2694, 2700–01 (1972)). Recalling that the trial court did, albeit in an untimely manner, conduct a status hearing, an initial permanency hearing, and a subsequent permanency hearing, we hold that S.M. is not entitled to relief for the trial court's failure to timely conduct the hearings because S.M. already received the process she was due. On these facts, we hold that the trial court did not violate S.M.'s procedural due process rights by failing to timely conduct the status hearing, the initial permanency hearing, or the subsequent permanency hearings. We overrule this portion of S.M.'s first issue.

## F. Cumulative Due Process Violation and Abuse of Discretion

In the final part of her first issue and in part of her second issue, S.M. contends that each of the above failures by the trial court and the Department cumulatively denied her the "procedural guarantees of the Texas Family Code to such an extent that her due process rights were violated" and that the trial court abused its discretion by denying the three motions in which she raised the

36

foregoing procedural issues. Although we do not condone the trial court and the Department's lack of diligence in this case, we have held that each of S.M.'s procedural due process arguments is without merit. Thus, we also hold that the trial court and the Department's actions or inactions did not cumulatively violate S.M.'s procedural due process rights and that the trial court did not abuse its discretion by denying the motions raising S.M.'s procedural due process complaints. Accordingly, we overrule the remainder of S.M.'s first issue and the first part of S.M.'s second issue.

## IV. Exclusion of Certified Transcript of Adversary Hearing

In the second part of her second issue, S.M. incorporates each of the arguments from her first issue and argues that the trial court erred by excluding from evidence at trial a certified transcript of the April 24, 2008 adversary hearing. We review a trial court's ruling to exclude evidence for an abuse of discretion. *See In re J.T.G.*, 121 S.W.3d 117, 133 (Tex. App.—Fort Worth 2003, no pet.) (citing *Nat'l Liabl. & Fire Ins. Co. v. Allen*, 15 S.W.3d 525, 527 (Tex. 2000)). We must "uphold the trial court's evidentiary ruling if there is any legitimate basis in the record for the ruling." *Id.* (citing *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998)).

When S.M. sought to admit the transcript of the adversary hearing into evidence at trial, the Department objected to the transcript as irrelevant, and the trial court sustained the objection. In making the objection, the Department's counsel stated on the record and outside the presence of the jury that the

37

Department would abandon the ground for termination relating to S.M.'s alleged failure to comply with court orders. On appeal, S.M. argues that the transcript was admissible because it "would have allowed the jury to understand the lack of effort on the Department's part in following the requirements statutorily placed upon the Department."

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex. R. Evid. 401. Had the Department sought termination of S.M.'s parental rights due at least in part to her alleged failure to comply with the trial court's orders, then the transcript of the adversary hearing might have arguably been relevant. *See id.* However, the Department abandoned that ground, and the trial court did not charge the jury on that ground. Thus, the transcript had no tendency to make any fact of consequence more or less probable. *See id.* Further, S.M. solicited testimony from Department personnel concerning the Department's non-compliance with statutory deadlines. Therefore, we hold that the trial court did not abuse its discretion by excluding the transcript of the April 24, 2008 adversary hearing from evidence, and we overrule the remainder of S.M.'s second issue.

## V. Sufficiency of the Evidence

S.M. argues in her third issue that the evidence is legally and factually insufficient to support the jury's findings that she knowingly placed or knowingly

38

allowed T.T.F. to remain in conditions or surroundings which endangered his physical or emotional well-being and that she engaged in conduct or knowingly placed T.T.F. with persons who engaged in conduct which endangered his physical or emotional well-being. She argues in her fourth issue that the evidence is legally and factually insufficient to support the jury's finding that termination of her parental rights is in T.T.F.'s best interest.

## A. Standards of Review

### 1. In General

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. *See* Tex. Fam. Code Ann. § 161.206(b) (Vernon 2008); *Holick*, 685 S.W.2d at 20. We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*,

685 S.W.2d at 20–21; *In re M.C.T.*, 250 S.W.3d 161, 167 (Tex. App.—Fort Worth 2008, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. *See* Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *See Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206. Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (Vernon 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

## 2. Legal Sufficiency

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a factfinder could

reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we must defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

### 3. Factual Sufficiency

In reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated section 161.001(1)(E) and that the termination of the

41

parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001(1)(E); *In re C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## B. Endangerment

S.M. argues in part of her third issue that the evidence is legally and factually insufficient to support the jury's finding that she engaged in conduct or knowingly placed T.T.F. with persons who engaged in conduct which endangered T.T.F.'s physical or emotional well-being.

### 1. Applicable Law

Family code section 161.001(1)(E) permits a trial court to order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(1)(E). Endangerment means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125; *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See J.T.G.*, 121 S.W.3d at 125; *see also* Tex.

42

Fam. Code Ann. § 161.001(1)(E). Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). To determine whether termination is necessary, courts may look to parental conduct occurring both before and after the child's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).

### 2. Analysis

The evidence is legally and factually sufficient to support the jury's finding that S.M. engaged in conduct that endangered T.T.F.'s physical or emotional well-being. S.M. was effectively homeless between August 2007 and March 2008. In March 2008, she moved into a house that had rat feces on the floor, exposed nails on the floorboards, and rotting meat on the counter, and she did not sufficiently clean the house despite being asked to do so by Durham and acknowledging the house's unsuitable condition. S.M. also allowed her Medicaid and food stamps to lapse in October 2007, and she admitted that the lapse made it difficult for her to provide for her children, including T.T.F. Indeed, T.T.F. did

43

not receive his immunizations when they were due because S.M. did not have Medicaid. S.M. took T.T.F. to the hospital in February 2008, and although she testified that she fed T.T.F., S.M. admitted that she did not previously take T.T.F. to a doctor to determine if there was a problem, even though she had noticed that he was not getting any bigger. It was only after T.T.F. became lethargic—he was just lying around and not crawling, bouncing up and down, or babbling as he would normally do—that S.M. took T.T.F. to the hospital.

Dr. Hollis testified that T.T.F. was acutely ill when she examined him on March 6, 2008. And after explaining that T.T.F. had fallen from the fiftieth percentile at birth to "around the third percentile" at thirteen months and opining that T.T.F.'s failure to thrive was caused by the lack of nutrition given to him by S.M., Dr. Hollis testified that T.T.F. was in danger of severe bodily injury or death at the time of the March 6 visit. In addition, Dr. Hollis opined that it constituted medical neglect for S.M. to allow T.T.F. to develop significant ear infections without taking him to the doctor.

In *In re S.G.S.*, 130 S.W.3d 223, 238 (Tex. App.—Beaumont 2004, no pet.), the court found legally sufficient evidence that the parents had engaged in conduct or knowingly placed their children with persons who engaged in conduct that endangered their children's physical or emotional well-being. The court noted, among other things, that one child had been diagnosed with failure to thrive, was critically ill at the time, and would have been at risk of death had the malnutrition continued and that the parents failed to provide a stable and safe

44

living environment for their children. *Id.* at 233, 238. And after acknowledging that "much of the [parents'] hardship was obviously attributable to their impoverishment," the court stated that "the evidence reveal[ed] more than mischance [because the parents] failed to secure for their children the basic necessities of life even to the extent available through public assistance." *Id.* at 238. Similar to the plight of the parents in *S.G.S.*, many of S.M.'s difficulties related to her impoverishment and were arguably compounded by her aggravated robbery arrest (for which the charges were subsequently dismissed), but S.M. allowed her government benefits to lapse, did not timely renew them, and neglected T.T.F.'s medical condition despite actual knowledge that he was not gaining weight.

S.M. argues that there is insufficient evidence of endangerment because the hospital did not diagnose T.T.F. with failure to thrive, because Dr. Hollis diagnosed T.T.F.'s failure to thrive on the first visit despite acknowledging that the condition cannot be diagnosed on one visit, because T.T.F. was stable when he was discharged from the hospital and when he visited Dr. Hollis, and because T.T.F. had numerous ear infections even while living with his foster parents. However, the hospital diagnosed T.T.F. with an ear infection, pneumonia, and RSV, and Dr. Hollis testified that her failure to thrive diagnosis was a working diagnosis and that she subsequently reviewed all of T.T.F.'s prior medical records. Finally, although T.T.F. had several ear infections after moving into foster care, the foster parents routinely took T.T.F. to see Dr. Hollis instead of

45

allowing his ear infections to worsen. Thus, the jury heard evidence from which it could reasonably form a firm conviction or belief that S.M. endangered T.T.F. S.M.'s argument merely points to conflicts in the evidence, and we are obligated to leave the resolution of those conflicts to the jury. *See J.P.B.*, 180 S.W.3d at 573 (requiring reviewing courts to view the evidence in the light most favorable to the verdict and to defer to the jury's determinations of credibility issues, "even when credibility issues are reflected in the written transcript").

S.M. also argues that the evidence of endangerment is insufficient because T.T.F. gained more weight when living with S.M. (0.61 pounds per month) than when living with his foster parents (0.5 pounds per month). However, S.M.'s argument focuses only on two of the six months that T.T.F. lived in foster care and ignores the evidence that T.T.F. fell from the fiftieth percentile to the third percentile while he lived with her. To the extent that there is any conflict in this evidence, the resolution of that conflict was for the jury. *See id.*

Viewing all the evidence in the light most favorable to the termination judgment, and disregarding all contrary evidence that a reasonable factfinder could disregard, we hold that the evidence is legally sufficient to support a factfinder's firm conviction or belief that S.M. engaged in conduct that endangered T.T.F.'s physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(E); *J.P.B.,* 180 S.W.3d at 573; *S.G.S.*, 130 S.W.3d at 238. Likewise, giving due deference to the jury as factfinder, we hold that the evidence is also factually sufficient to support the jury's finding that S.M. engaged in

46

conduct that endangered T.T.F.'s physical well-being. We therefore overrule S.M.'s third issue.[17]

## C. Best Interests of the Child

### 1. Applicable Law

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (Vernon 2008). The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

(1)   the child's age and physical and mental vulnerabilities;

(2)   the frequency and nature of out-of-home placements;

(3)   the magnitude, frequency, and circumstances of the harm to the child;

(4)   whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5)   whether the child is fearful of living in or returning to the child's home;

(6)   the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

---

[17]Because we hold that the evidence is legally and factually sufficient to support the jury's finding that S.M. engaged in conduct that endangered T.T.F.'s physical or emotional well-being, we need not address the remainder of S.M.'s third issue. *See* Tex. R. App. P. 47.1.

47

(7)     whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8)     whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9)     whether the perpetrator of the harm to the child is identified;

(10)    the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11)    the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12)    whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

(A)     minimally adequate health and nutritional care;

(B)     care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

(C)     guidance and supervision consistent with the child's safety;

(D)     a safe physical home environment;

(E)     protection from repeated exposure to violence even though the violence may not be directed at the child; and

(F)     an understanding of the child's needs and capabilities; and

(13)    whether an adequate social support system consisting of an extended family and friends is available to the child.

48

*Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.[18]  These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.  *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child.  *Id.*  On the other hand, the presence of scant evidence relevant to each factor will not support such a finding.  *Id.*

## 2. Analysis

While there is a strong presumption that keeping a child with a parent is in the child's best interest, the record shows that the evidence is legally and factually sufficient to support the jury's finding that termination of S.M.'s parental rights is in T.T.F.'s best interest.  *See* Tex. Fam. Code Ann. § 106.001(2); *R.R.*, 209 S.W.3d at 116.

---

[18]Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

> (A) the desires of the child; (B) the emotional and physical needs of the child now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the programs available to assist these individuals to promote the best interest of the child; (F) the plans for the child by these individuals or by the agency seeking custody; (G) the stability of the home or proposed placement; (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

T.T.F. was two years and seven months old at the time of trial, but he had lived with S.M. for only about eight or nine of his thirty-one months.[19] *See* Tex. Fam. Code Ann. § 263.307(b)(1)–(2). T.T.F. was removed at approximately two months old, returned to S.M. at approximately seven months old, and removed a second time at thirteen and one-half months old. *See id.* § 263.307(b)(2), (4). While living with S.M. from September 2007 through March 2008, T.T.F. dropped to the third percentile in weight for his age, and he developed pneumonia, RSV, and ear infections. *See id.* § 263.307(b)(9). In addition, T.T.F.'s lack of development during that period required speech and behavioral therapy, and he regressed from the "happy-go-lucky," thriving child that left the foster parents' home at six months old to cowering over his food and being hesitant of strangers at thirteen months old. *See id.* § 263.307(b)(1).

Concerning the magnitude, frequency, and circumstances of the harm to T.T.F., S.M. points to testimony stating that there is no indication that T.T.F. suffered permanent harm from his time with S.M. *See id.* § 263.307(b)(3). Although the evidence suggests that T.T.F. was healthy and thriving at the time of trial, Dr. Hollis testified that it will be some time before she can determine whether T.T.F. will have learning disabilities or other deficiencies associated with poor brain growth. And even if T.T.F. avoided permanent harm, the evidence

---

[19]S.M.'s four oldest children have also lived for extended periods in foster care, and the Department is the managing or temporary conservator for each of S.M.'s four oldest children.

clearly supports a conclusion that T.T.F. was endangered while living with S.M. For example, Dr. Hollis testified that T.T.F.'s failure to thrive was caused by S.M.'s failure to provide him with sufficient nutrition, that failure to thrive is dangerous because it means the body does not have adequate calories for muscle, bone, and brain growth, that failure to thrive can cause a child to die, and that T.T.F. was in danger of severe bodily injury or death on March 6, 2008. Moreover, T.T.F. was in this condition the day after being removed from the house on Cleveland Street that had rat feces on the floor, feces on the door, boards with exposed nails, and rotten meat on the counter. *See id.*

There is also evidence of a history of abusive, assaultive, or threatening conduct by S.M. and her acquaintances. *See id.* § 263.307(b)(7). While there is no evidence that S.M. has physically abused any of her children, S.M. admitted problems with family violence and aggravated assault—she admitted to physical altercations with her friend T'Neal, her mother, and the fathers of her children— and that some of the incidents occurred in the presence of her children. And although S.M. did not physically assault any Department workers, she verbally threatened Durham more than once, hung up on Johnson many times and within two months of trial, and yelled at Johnson and other Department workers.

Although S.M.'s last positive drug test was almost two years before trial, she does have a history of substance abuse. *See id.* § 263.307(b)(8). S.M.'s first involvement with the Department occurred because J.K.P was with her in May 2002 when she fainted after smoking marijuana. In March 2007, when

51

T.T.F. was approximately two months old, S.M. tested positive for cocaine, necessitating the Department's first removal of T.T.F. S.M. also had a positive drug test in October 2007, the month after the Department returned her five children to her following the March 2007 removal. There is, however, evidence that S.M. has not had substance abuse problems since October 2007; Durham acknowledged that drugs have not been "an everyday problem" for S.M., and S.M. testified that she no longer uses drugs and that she is not drug-tested anymore.

There is also evidence that S.M. has demonstrated some level of willingness to complete her service plan, to cooperate with the Department's supervision, to make positive environmental and personal changes, and to improve her parenting skills. *See id.* § 263.307(b)(10)–(13). S.M. attended and completed parenting classes and counseling through the Christian Women's Job Corps after March 2008 where she learned age-appropriate discipline techniques, allowed announced and unannounced home visits, and prepared written budgets with Johnson. S.M. also obtained a legal source of income through social security benefits, and she lived in appropriate housing for approximately ten months before trial—six months at the mission and almost four months in her current house. S.M. has also kept up with her government benefits since G.J.M.B.'s birth. G.J.M.B. is healthy and does not have any developmental difficulties, and S.M. cares for and appropriately nurtures G.J.M.B.; Johnson testified that S.M. "appears to be a good mother" to G.J.M.B.

52

But S.M.'s improvement must also be viewed in context with her prior conduct. *See D.M.*, 58 S.W.3d at 814 (noting that the best interest of the child is often "infused with the statutory offensive behavior" but stating that "the best interest determination must have a firm basis in facts standing apart from the offending behavior"). S.M. has a substantial history with the Department, dating to her May 2002 marijuana fainting incident, and all of her children were removed in December 2005 after she left them with a friend's mentally ill neighbor. Further, Johnson referred S.M. to the Helen Farabee Center so that she could maintain minimal employment to increase her monthly income while also not losing her social security benefits, but S.M. did not show up for her interview.

Moreover, S.M.'s stated attitude was that it was the Department's responsibility to provide her children with basic necessities. And although S.M. qualified for Medicaid and food stamps, she allowed both to lapse in October 2007 and did not reinstate them by March 2008. It was at the end of this period that T.T.F. was diagnosed as failure to thrive. Durham testified that S.M. did not seem to comprehend the danger of T.T.F.'s failure to thrive diagnosis, and S.M. testified that she is "borderline intellectual functioning," meaning that she has difficulty understanding sophisticated needs like those of a child.

The evidence of S.M.'s improved parenting skills and stability must be balanced against the relative brevity of her stability in light of her age. *See In re S.B.*, 207 S.W.3d 877, 887 (Tex. App.—Fort Worth 2006, no pet.) ("Evidence of a parent's unstable lifestyle can support a factfinder's conclusion that termination is

53

in the child's best interest."); *see also In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (explaining that a father's "efforts to improve his ability to effectively parent on the eve of trial [were] not enough to overcome a decade of poor parenting and neglect"). S.M. maintained a stable home of her own for less than four months out of her eleven years as an adult. There is also evidence that S.M. does not have a support system, such as extended family or friends, available to assist her if her parental rights are not terminated. *See* Tex. Fam. Code § 236.307(b)(13).

The jury also heard evidence concerning several of the *Holley* factors. *See* 544 S.W.2d at 371–72. For example, the jury heard evidence that many of S.M.'s difficulties are related to her impoverishment and were arguably compounded by the aggravated robbery charge that was later dismissed. *See id.* at 372 (excuses for the parent's acts or omissions). There is also evidence that S.M. loves her children, that she does not miss visitations with her children, and that Johnson has seen T.T.F. run to his mother at visitation and tell her that he loves her. *See id.* ("the desires of the child" and "the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one"). But the jury also heard evidence that T.T.F. was a "happy-go-lucky," thriving child when he returned to S.M. at six months old but that he cowered over his food and was hesitant of strangers at thirteen months old. T.T.F. also had speech and behavioral problems that necessitated therapy, and

he has benefitted from therapy. *See id.* (listing the child's emotional and physical needs and danger now and in the future).

Moreover, the foster parents would like to adopt T.T.F. *See id.* (plans for the child by those seeking custody). T.T.F. is very attached to his foster parents and feels safe with them. The foster parents adore T.T.F. and treat him as one of their own children, and their home is stable and provides him with a normal routine. *See id.* (stability of the home or proposed placement). The foster mother has learned how to manage T.T.F.'s angry outbursts, is observant and very willing to get T.T.F. the help that he needs, and has helped him regain his health after his failure to thrive diagnosis. *See id.* (parenting ability of the individuals seeking custody). J.K.P. is also living with the same foster parents. J.K.P. reads books to T.T.F., and the bond between J.K.P. and T.T.F. has strengthened. T.T.F. was "very happy and bouncing around because [J.K.P.] came to live at the same home."

Clearly, the jury heard conflicting evidence relevant to its best interest finding. S.M. maintained suitable housing for herself and G.J.M.B., and she has demonstrated improvement with her parenting skills. But S.M. first established some stability in the months before trial; her monthly income is barely enough to provide for her and G.J.M.B.; her improvement is better in some areas than others; she has a significant history of Department involvement, questionable decisions, and instability; and T.T.F.'s foster parents would like to adopt him and have provided him with the stability he never had with S.M. The evidence

55

presents a close case, but viewing the evidence in the light most favorable to the finding and judgment, we conclude that the evidence is such that the jury could reasonably form a firm belief or conviction that termination of S.M.'s parental rights is in T.T.F.'s best interest. *See J.P.B.*, 180 S.W.3d at 573. We also conclude, viewing all the evidence in a neutral light, that the jury could reasonably form a firm conviction or belief that termination is in T.T.F.'s best interest. *See H.R.M.*, 209 S.W.3d at 108. We therefore hold that the evidence is legally and factually sufficient to support the jury's best interest finding, and we overrule S.M.'s fourth issue.

## VI. Conclusion

Having overruled each of S.M.'s four issues, we affirm the trial court's judgment.

ANNE GARDNER
JUSTICE

PANEL: DAUPHINOT, GARDNER, and WALKER, JJ.

DELIVERED: December 2, 2010