

**IN THE**
**TENTH COURT OF APPEALS**

_____

**No. 10-17-00279-CV**

**IN THE INTEREST OF L.B., L.B., N.B., AND A.B.,**
**CHILDREN**

_____

**From the 74th District Court**
**McLennan County, Texas**
**Trial Court No. 2016-920-3**

_____

## MEMORANDUM OPINION

_____

The trial court terminated the parental rights of D.B., the father of L.B., La'D.B.,[1]

N.B., and A.B., after a bench trial.[2]  The trial court found that D.B. had violated Family

Code subsections 161.001(b)(1)(D), (E), (N), and (O) and that termination was in the

children's best interest.  In eight issues, D.B. challenges the legal and factual sufficiency

of the evidence to support the trial court's findings that he violated each of the predicate

_____

[1] We refer to the second child as La'D.B. to eliminate confusion.

[2] The parental rights of the mother of the children ("Mother") were also terminated, but she has not appealed.

violations. D.B. does not challenge the trial court's finding that termination was in the best interest of the children. We will affirm.

In a proceeding to terminate the parent-child relationship brought under Family Code section 161.001, the Department of Family and Protective Services must establish by clear and convincing evidence two elements: (1) one or more acts or omissions enumerated under subsection (b)(1) of section 161.001, termed a predicate violation; and (2) that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(1), (2) (West Supp. 2017); *Swate v. Swate*, 72 S.W.3d 763, 766 (Tex. App.—Waco 2002, pet. denied). The factfinder must find that both elements are established by clear and convincing evidence, and proof of one element does not relieve the petitioner of the burden of proving the other. *Holley v. Adams*, 544 S.W.2d 367, 370 (Tex. 1976); *Swate*, 72 S.W.3d at 766. "Clear and convincing evidence" is defined as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980).

Both legal and factual sufficiency reviews in termination cases must take into consideration whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the matter on which the petitioner bears the burden of proof. *In re J.F.C.*, 96 S.W.3d 256, 264-68 (Tex. 2002) (discussing legal sufficiency review); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (discussing factual sufficiency review).

In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible.

*J.F.C.*, 96 S.W.3d at 266.

In a factual sufficiency review, a court of appeals must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id.*

[T]he inquiry must be "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." A court of appeals should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient.

*Id.* (footnotes and citations omitted); *see C.H.*, 89 S.W.2d at 25.

We give due deference to the factfinder's findings and must not substitute our judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The factfinder is the sole judge "of the credibility of the witnesses and the weight to give their testimony." *Jordan v. Dossey*, 325 S.W.3d 700, 713 (Tex. App.—Houston [1st Dist.] 2010, pet. denied*)*. The factfinder may choose to believe one witness and disbelieve another. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). The factfinder is free to believe or

disbelieve the testimony of any witness, and it may accept or reject all or part of a witness's testimony. *In re C.E.S.*, 400 S.W.3d 187, 195 (Tex. App.—El Paso 2013, no pet.).

If multiple predicate violations under subsection 161.001(b)(1) were found in the trial court, we can affirm based on any one ground because only one predicate violation under subsection 161.001(b)(1) is necessary to a termination judgment. *In re T.N.F.*, 205 S.W.3d 625, 629 (Tex. App.—Waco 2006, pet. denied), *overruled in part on other grounds by In re A.M.*, 385 S.W.3d 74, 79 (Tex. App.—Waco 2012, pet. denied).

Termination under subsection 161.001(b)(1)(D) requires clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Termination under subsection 161.001(b)(1)(E) requires clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id*. § 161.001(b)(1)(E). Because the evidence relevant to sections 161.001(b)(1)(D) and (E) is interrelated, we address those grounds together. *See In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

Both subsections require proof of endangerment, which means to expose to loss or injury, to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). While "endanger" means "more than

a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Boyd*, 727 S.W.2d at 533. Further, the danger to a child may be inferred from parental misconduct. *Id*.

> When the termination is based on (D), the endangerment analysis
>
> focuses on the evidence of the child's physical environment, although the environment produced by the conduct of the parents bears on the determination of whether the child's surroundings threaten his well-being. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Section D permits termination if the petitioner proves parental conduct caused a child to be placed or remain in an endangering environment. *In re R.D.*, 955 S.W.2d 364, 367 (Tex. App.—San Antonio 1997, pet. denied).
>
> It is not necessary that the parent's conduct be directed towards the child or that the child actually be injured; rather, a child is endangered when the environment creates a potential for danger which the parent is aware of but disregards. *In re S.M.L.*, 171 S.W.3d at 477. Conduct that demonstrates awareness of an endangering environment is sufficient to show endangerment. *Id*. (citing *In re Tidwell*, 35 S.W.3d 115, 119-20 (Tex. App.—Texarkana 2000, no pet.) ("[I]t is not necessary for [the mother] to have had certain knowledge that one of the [sexual molestation] offenses actually occurred; it is sufficient that she was aware of the potential for danger to the children and disregarded that risk by . . . leaving the children in that environment.")). In considering whether to terminate parental rights, the court may look at parental conduct both before and after the birth of the child. *Avery v. State*, 963 S.W.2d 550, 553 (Tex. App.—Houston [1st Dist.] 1997, no pet.). Section D permits termination based upon only a single act or omission. *In re R.D.*, 955 S.W.2d at 367.

*Jordan*, 325 S.W.3d at 721.

When termination is based upon (E), the relevant inquiry is whether evidence exists that the endangerment of the child's well-being was the direct result of the parent's

or another's conduct, including acts, omissions, or failures to act. *In re K.A.S.*, 131 S.W.3d 215, 222 (Tex. App.—Fort Worth 2004, pet. denied); *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 83-84 (Tex. App.—Dallas 1995, no writ).

> Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *In re J.T.G.*, 121 S.W.3d [117, 125 (Tex. App.—Fort Worth 2003, no pet.)]; *see also* TEX. FAM. CODE ANN. § 161.001[(b)](1)(E). It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

*In re T.T.F.*, 331 S.W.3d 461, 483 (Tex. App.—Fort Worth 2010, no pet.).

In this case, the trial mostly centered upon the failings of Mother, as she was the children's primary caregiver. The evidence and testimony reflected that Mother is a chronic liar, has terrible choice in men,[3] and was involved in various illegal activities, leaving her little time to effectively care for her children. The evidence and testimony nevertheless also reflected that D.B. knew about Mother's inadequacies but did nothing to protect the children from her. D.B.'s testimony also reflected his own failings as a father.

---

[3] In addition to her relationship with D.B., a registered sex offender, Mother was married twice. Her first husband received a lengthy sentence for narcotics trafficking, and her second husband was convicted of killing another man. Mother married her second husband while he was in jail awaiting trial. Mother admitted that she had been present when the killing occurred. She was still married to her second husband when she and D.B. had L.B., La'D.B., N.B., and A.B. After D.B. was arrested on his most recent charge, Mother began a relationship with C.J., who also ended up in jail.

Kimberly Whitt, an alternative response specialist with CPS, testified that L.B., who had been returned to Mother's custody, was removed a second time after he was injured while unsupervised. Whitt noted that L.B. is deaf and hyperactive and that he should not be allowed outside unsupervised. Whitt testified that L.B., who was five years old, had collided with a truck while riding his bicycle. The man involved in the accident, Timothy Head, testified that he was unable to communicate with L.B. and that he saw no adults around. Head noted that he finally was able to get L.B. to his grandmother's apartment with assistance from other children who were playing in the area.

D.B. denied during his testimony that he and Mother were in a relationship or that they planned to get together again when he is released from jail. He admitted, however, that he phoned Mother from jail whenever he had enough money in his jail account to pay for the calls, often twice a day. The phone calls were recorded and revealed the relationship between D.B. and Mother. The calls also revealed D.B.'s knowledge of Mother's living arrangements, her activities, and her treatment of L.B. One such call included the following exchange:

> Mother: *Fuck. Fuck. I couldn't answer because the car - - I was right here with the fucking cops, man. I am following* [Grandmother] *to the house. They just took Bay Bay to jail.*

> D.B.: *What?*

> Mother: *I am - - I had to go get - - I had to leave class and go get* [Grandmother]. *I'm talking - - I'm talking on the speakerphone because I have to have it in my lap because there is cops behind me. But their phone went up to the house because* [Grandmother] *don't have a license and there's no insurance - -*

> *Shut the fuck up.* [Mother talking to L.B.]
> *There ain't no insurance on the car, so they are following us to* [Grandmother's] *house.*

> D.B.: *Wow.*

Another call included the following:

> Mother: *Okay. Damn, man. Wait. Calm your fucking ass down.* [Talking to L.B.]

> D.B.: *I don't even hear him. Why are you yelling?*

> Mother: *He - - man, he - - say something to your daddy. Go aaahhh. He's right here and trying to get me to open his fucking candy and I told him he couldn't have it.*
> *Here, man. Here, take it. Get away from me.*

Both D.B. and Mother testified that they did not believe that her verbal tirades had an effect on L.B. since he was deaf. D.B. acknowledged, however, that cursing at L.B. was not appropriate. D.B.'s testimony reflects that he did nothing to protect L.B. from Mother's abusive behavior. D.B. agreed that he did not try to calm her down nor did he protest her treatment of L.B.

D.B. further testified that he knew Mother was involved in illegal and inappropriate activities. D.B. knew that Mother was driving without a driver's license or insurance and that she could be arrested if stopped by the police. As reflected in one of the recorded conversations, D.B. also knew that L.B. was in the car while Mother was driving illegally. D.B. further testified that he knew Mother liked to gamble and that he had conversations with her about the money she was losing. D.B. admitted that he knew

gambling was illegal in Texas and that Mother was breaking the law. D.B. further noted that he knew Mother had financial problems because she was unemployed and that he told her on more than one occasion to get a job. Mother testified that she had been supporting herself and the children on L.B.'s disability checks. It was not until L.B. was removed from her custody that she found employment, although she provided no verification of her employment to the Department.

D.B. testified that he knew Mother had been living with another man—C.J. D.B. did not approve of the relationship because he did not believe that C.J. should be around the children. D.B. stated that he knew that C.J.'s children had been removed from his custody by the Department. D.B. also testified that he knew C.J. had been incarcerated while D.B. was in jail. Mother knew about C.J.'s incarceration because she testified that she also accepted calls from him from the jail.

D.B. admitted that he made no attempt to report Mother's verbal abuse of L.B. or her illegal and inappropriate activities to the Department. While D.B. argues that he did not have the ability to contact anyone about Mother's conduct while he was in jail, the trial court could have reasonably concluded that D.B. could have reported the abuse to his lawyer, to the Department employees who were present during the hearings held in the case, or even to the judge who presided over the hearings.

D.B. also testified about his own situation and treatment of the children. D.B. admitted at trial that he had been convicted twice for failing to register as a sex offender.

He further testified that his parole was revoked when he cut off his ankle monitor and that he has misdemeanor convictions for assault family violence and criminal trespass. At the time of trial, D.B. was still in jail after being arrested for allegedly sexually assaulting his niece. The trial court could have reasonably concluded that D.B.'s recent incarceration would continue and that he would be subject to incarceration in the future.

Incarceration by itself does not "constitute engaging in conduct that endangers the physical or emotional well-being of the child." *Robinson v. Tex. Dep't of Protective & Regulatory Servs.*, 89 S.W.3d 679, 686 (Tex. App.—Houston [1st Dist.] 2002, no pet.) "However, if all the evidence, including imprisonment, shows a course of conduct that has the effect of endangering the physical or emotional well-being of the child, a finding under section 161.001[(b)](1)(E) is supportable." *Id.*; *see also In re S.T.*, 263 S.W.3d 394, 401 (Tex. App.—Waco 2008, pet. denied) ("[E]vidence of imprisonment may be considered with other evidence tending to establish that the parent has engaged in a course of conduct which has the effect of endangering the child, and collectively such evidence can support a finding to this effect."). Multiple incarcerations "subject[ ] a child to a life of uncertainty[,] and instability endangers the physical and emotional well-being of a child." *See In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

Despite his multiple incarcerations, the evidence reflects that D.B. continued to engage in illegal activities even after the children were removed from his custody. In a recorded jail conversation with Mother, D.B. gave her advice on how to successfully

complete a scam involving a falsified automobile title loan. "[A] court may consider evidence establishing that a parent continued to engage in endangering conduct after the child's removal by the Department or after the child no longer was in the parent's care, thus showing the parent continued to engage in the course of conduct in question." *In re C.A.B.*, 289 S.W.3d 874, 883 (Tex. App.—Houston [14th Dist.] 2009, no pet.). "Intentional criminal activity that exposes a parent to incarceration is conduct that endangers the physical and emotional well-being of a child." *In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). While D.B. denied knowing that the falsification of the documents was illegal, the trial court, as the factfinder, could have disbelieved that testimony.

D.B. also testified that he had been using marijuana since the age of nine. He was forced to refrain from the use of marijuana only because he was in jail. A parent's use of illegal drugs, and its effect on his or her ability to parent, may qualify as an endangering course of conduct. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009).

> A parent's illegal drug use and drug-related criminal activity may . . . support a finding that the child's surroundings endanger his or her physical or emotional wellbeing. And "[b]ecause it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under section 161.001(1)(E)." A parent's continued drug use demonstrates an inability to provide for the child's emotional and physical needs and to provide a stable environment for the child.

*In re M.R.R.*, No. 10-15-00303-CV, 2016 WL 192583, at *4 (Tex. App.—Waco Jan. 14, 2016, no pet.) (mem. op.) (citations omitted); *see also In re Z.C.*, 280 S.W.3d 470, 474 (Tex. App.—

Fort Worth 2009, pet. denied). The trial court could have reasonably concluded that D.B.'s marijuana use would continue when he was released from jail and constitute an inability to provide for the children's emotional and physical needs or to provide a stable environment for them.

D.B.'s testimony further established that he was also verbally abusive to L.B. D.B. testified that he and Mother had nicknamed L.B. "Mun'sir," which D.B. testified meant "Monster." He again attempted to excuse his behavior by noting that L.B. was deaf and could not hear what they said. The verbal abuse was not solely directed at L.B. D.B. testified that he and Mother also used the nickname "Sticky Butt" for La'D.B. and that they laughed about her dyslexic tendencies.

Evidence of a parent's endangering conduct toward other children or family members is relevant to a determination of whether the parent engaged in behavior that endangered the child that is the subject of the suit. *See In re D.L.N.*, 958 S.W.2d 934, 939 (Tex. App.—Waco 1997, pet. denied), *disapproved of on other grounds by J.F.C.*, 96 S.W.3d at 267 n.39 *and C.H.*, 89 S.W.3d at 26 (holding that a parent's neglect of older children could indicate that the child that is the subject of the suit "would face this type of treatment in the future if returned" to the parent); *see also In re H.N.J.*, No. 10-10-00365-CV, 2011 WL 2937473, at *3 (Tex. App.—Waco Jul. 13, 2011, no pet.) (mem. op.) (citing *Cervantes-Peterson v. Tex. Dep't of Family and Protective Servs.*, 221 S.W.3d 244, 253 (Tex. App.—Houston [1st Dist.] 2006, no pet.)) ("[T]he manner in which a parent treats other

children in the family can be considered in deciding whether that parent engaged in a course of conduct that endangered the physical or emotional well-being of a child."). The trial court could have reasonably inferred that the manner in which D.B. and Mother treated L.B. and La'D.B. was an indicator of their treatment of N.B. and A.B.

D.B. additionally testified that he had no contact with the children for the year that he had been incarcerated other than waving at L.B. at one of the hearings. D.B. also had previously agreed to waive his parental rights if it would help Mother retain custody. Further, the numerous recorded conversations with Mother were spent arguing and berating each other rather than expressing any concern for the welfare of the children. "A lack of all contact with a child without any proffered excuse and no effort to ensure her safety—coupled with incarceration and illegal drug use—is sufficient to support a termination finding based on endangerment." *In re Z.N.M.*, No. 14-17-00650-CV, 2018 WL 358480, at *6 (Tex. App.—Houston [14th Dist.] Jan. 11, 2018, no pet.). The trial court could have reasonably concluded that D.B.'s behavior, as well as Mother's, constituted a continuing danger to the children and that D.B. permitted the children to remain in an endangering environment. As the ad litem noted in closing argument, there has never been a case "where a mother and a father have less of a moral compass than these two people."

Viewing all the evidence in the light most favorable to the trial court's findings, we therefore conclude that a reasonable trier of fact could have formed a firm belief or

conviction that D.B. knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being and that D.B. engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being. We hold that the evidence is legally sufficient to establish that D.B. violated Family Code subsections 161.001(b)(1)(D) and (E).

Viewing the evidence as a whole, we also conclude that a factfinder could have reasonably formed a firm belief or conviction that D.B. knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being and that D.B. engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being. We therefore hold that the evidence is factually sufficient to establish that D.B. violated Family Code subsections 161.001(b)(1)(D) and (E). We thus overrule D.B.'s first four issues.

Because we have overruled D.B.'s first four issues, we do not reach D.B.'s remaining issues that challenge the legal and factual sufficiency of the evidence as it relates to the violation of subsections (N) and (O). *See In re S.L.*, 421 S.W.3d 34, 37 (Tex. App.—Waco 2013, no pet.) (if the trial court finds multiple predicate violations, we may affirm based on any one ground). We affirm the trial court's order of termination.

REX D. DAVIS
Justice

Before Chief Justice Gray,*
     Justice Davis, and
     Justice Scoggins
     *(Chief Justice Gray concurs in the court's judgment to the extent it affirms the trial court's judgment.  A separate opinion will not issue.)
Affirmed
Opinion delivered and filed March 21, 2018
[CV06]

